NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

Jack W. SELLERS, Virginia Sellers Rop-
er, Gladys Sellers, and L. H. Penny, Co-
Partners, d/b/a Coca-Cola Bottling Com-
pany of Sacramento, Coca-Cola Bottling
Company of Marysville, Coca-Cola Bot-
tling Company of Sacramento, Ltd.,
d/b/a Lake Tahoe Coca-Cola Bottling
Company, Coca-Cola Bottling Company
of Sacramento, Ltd., C–C Concession
Company, Inc., Respondents.

No. 19356.

United States Court of Appeals
Ninth Circuit.

June 8, 1965.

Rehearing Denied July 27, 1965.

Arnold Ordman, Gen. Counsel, Domi-
nick L. Manoli, Associate Gen. Counsel,
Marcel Mallet-Prevost, Asst. Gen. Coun-
sel, Glen M. Bendixsen, Harold B. Shore,
Attys., N. L. R. B., Washington, D. C., for
petitioner.

M. B. Jackson, Hill, Farrer & Burrill,
Los Angeles, Cal., for respondents.

Before BARNES, JERTBERG and
MERRILL, Circuit Judges.

JERTBERG, Circuit Judge.

This case is before the Court on the
petition of the National Labor Relations
Board (hereinafter the "Board"), for
enforcement of its order issued against
respondents on April 24, 1964, pursuant
to Section 10(e) of the National Labor
Relations Act, as amended (29 U.S.C. §
151 et seq.). The Board's decision and
order are recorded at 146 N.L.R.B. No.
128. This court has jurisdiction of the
proceedings under §§ 10(e) and (f) of
the Act. No issue as to the Board's
jurisdiction is presented.

The Board found that respondents vio-
lated § 8(a) (2) and (1) of the Act by

unlawfully assisting and contributing support to the Sacramento Coca-Cola Bottlers Employees' Union (hereinafter called the "Union"); that respondents violated § 8(a) (3) and (1) of the Act by discharging employees Gary Lechner and Leon Maynard because of their activities in opposition to the Union and on behalf of Chauffeurs, Teamsters and Helpers, Local 150, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereinafter called the "Teamsters"); and that respondents violated § 8(a) (1) of the Act by allegedly interrogating and threatening their employees concerning their protected activities.

The following facts appear to be undisputed. Respondents are engaged in the soft drink bottling and distribution business in the Sacramento, California area. It operates there out of two locations: the main plant in Sacramento proper, and a second plant in North Highland. There are approximately ten Route Salesmen employed in each of the two plants. The Route Salesmen's duties are varied but consist principally of delivering Coca-Cola to retail establishments in company trucks. The respondents' staff as of April 1, 1963 with whose testimony we are primarily concerned (except Charles Glaser who did not testify) may be shown as follows:

Jack Sellers, Owner and General Manager
J. Tyler Taylor, Asst. General Manager
Dino Dal Porto, Sales Manager

| *Main Plant* | *North Highlands Plant* |
|---|---|
| George Baxter, District Manager | Charles Glaser, Dist. Manager |
| Vincent Di Renzo, Route Manager | Odell Van Natta, Route Manager |
| Leon Maynard, Route Salesman | Gary Lechner, Route Salesman |
| Edward Hayes, Route Salesman | Robert Coons, Route Salesman |
| George Coons, Route Salesman | Joe Maxwell, Route Salesman |

Harry Hendricks, Special Representative.

———◆———

In February 1963, the title "Route Supervisor" became "District Manager", and the title "Assistant Route Supervisor" became "Route Manager".

The duties of Hendricks as "Special Representative" are discussed later in this opinion. He was secretary-treasurer of the Union whose total membership was approximately seventy-five.

For some 5 to 6 years preceding April 1, 1963, respondents' employees, with the exception of clerical and office workers, were members of the Union. Membership of the Union is limited to employees of respondents and included the two District Managers and those to whom they were superior.

Applicants for employment with respondents and those considered for promotion are interviewed at the offices of W. W. White & Associates, Inc. (hereinafter "White") which firm is retained by respondents to conduct pre-employment interviews and background screening.

The employment contract of the Union with respondents was to expire on March 31, 1963. A meeting of the Union was held on March 21, 1963 to discuss and formulate demands concerning a new contract. Among those present at the meeting were Glaser, Van Natta, and Di Renzo, as well as Lechner. Lechner, dissatisfied with the conduct of the meeting, left before it was concluded. Following the meeting some discussion and negotiations relative to a new contract occurred between representatives of the Union and respondents. Shortly thereafter respondents prepared and presented as a "final offer" a proposed contract. This contract was discussed and considered by the North Highlands membership of the Union. The members in attendance voted unanimously to accept the contract as

proposed, and appointed a representative to attend the general meeting of the Union to be held in Sacramento later in the week ending Sunday, March 31st. Because of some difficulty encountered in hiring a hall for the Union meeting, the meeting was not held until Monday morning, April 1st, the day after the expiration of the current contract. Prior to the Union meeting Sellers called a meeting of the employees of both plants to be held in Sacramento at the commencement of work on Monday morning. At such meeting of employees, Sellers informed those in attendance that the current contract had expired the day before; that the proposed contract was the best and final offer of respondents, and that he recognized the Union as the bargaining agent; and that he did not desire to do business with other labor organizations. Following Sellers' talk, a meeting of the Union was held at the V.F.W. Hall in the Sacramento area. At that meeting Glaser, Baxter, Van Natta, and Di Renzo were present as well as Lechner and Maynard. At the meeting Lechner requested the Secretary to read the contract. Hendricks did so. Lechner then requested a seventy-two hour postponement to permit further study of the proposed contract before voting upon the same. The motion was submitted to a vote and was defeated. Maynard and several other employees supported Lechner's motion. The proposed contract was then submitted to the members and was approved by a majority of the members of the Union and was signed that day.

On Tuesday, April 2nd, Lechner and Maynard were discharged.

Further discussion of the testimony taken before the Trial Examiner will be considered in connection with a discussion of the violations found by the Board to have been committed by respondents.

The Trial Examiner concluded:

1. That the respondents had engaged in Unfair Labor practices within the meaning of Section 8(a) (3) of the Act by discriminating regarding the hire and tenure of employment of Lechner and Maynard to encourage adherence to the Union and to discourage activity on behalf of the Teamsters or other labor organization;

2. Respondents had engaged in Unfair Labor practices within the meaning of Section 8(a) (2) of the Act by dominating the administration of and by contributing support to the Union; and

3. Respondents had engaged in Unfair Labor practices within the meaning of Section 8(a) (1) of the Act by the discharges, by the domination and support of the Union, and by interrogating and threatening employees in regard to their membership, affiliation or sympathies with Teamsters or other labor organizations.

Exceptions were filed by respondents to the Trial Examiner's decision. The Board, in adopting the findings of the Trial Examiner, stated:

"We agree with the Trial Examiner that the Respondents violated Section 8(a) (1), (2), and (3) of the Act. We are in accord with the Trial Examiner that the Respondents unlawfully assisted the Bottlers' Union, but do not adopt his conclusion that domination was established. We rely particularly upon the practice of Respondents' clerk in handing Bottlers' authorization and checkoff cards to new employees when they were first reporting for work; the participation by management representatives in the Union's meetings; the fact that a management representative, Hendricks, was an officer of the Union and engaged in negotiations with the Employer; and Respondents' conduct in impressing upon its employees that only Bottlers was acceptable as their bargaining agent." (Citations omitted.)

Respondent's main thrust in opposing the petition for enforcement is that the evidence before the Trial Examiner, when considered in the light of the record as a whole, is insufficient to support the conclusions and order of the Board. The relevant provisions of the National Labor

Relations Act, as amended, are as follows:

## "RIGHTS OF EMPLOYEES

"Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3).

## "UNFAIR LABOR PRACTICES

"Sec. 8. (a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it. * * *

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. * * *

\* \* \* \* \* \*"

We have carefully reviewed the entire record of this case in the light of the admonition expressed in Universal Camera Corporation v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) and its companion case, N. L. R. B. v. Pittsburgh S.S. Co., 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479 (1951) that it is our duty in determining the substantiality of evidence supporting a Labor Board decision to take into account contradictory evidence or evidence from which conflicting inferences could be drawn, and whatever in the record fairly detracts from its weight.

With such preface we now proceed to discuss violations of the Act which the Board found to exist.

The Trial Examiner and the Board found as a fact "that Lechner and Maynard were discharged on April 2nd because of their opposition to Bottlers [Union] as a bargaining representative, because of their disapproval of the new contract, and because of Respondents' belief that the two of them and others constituted a threat to continued representative status of Bottlers, entailing the possibility that another labor organization might be chosen by the employees." While we note in the record that there is much testimony on behalf of the Respondents that the two were discharged because of the unsatisfactory manner in which they discharged their duties; that Respondents were unaware of such activities at the time of discharge; and that the credibility of Lechner and Baxter as witnesses was impaired, nevertheless we believe that such findings in respect to Lechner and Maynard are supported by substantial evidence when viewed in the light of the entire record. Clearly, Lechner was openly dissatisfied with the representation furnished by the Union and the manner in which the Union conducted its meetings. Maynard actively supported Lechner. Lechner was active in securing the assistance of the Teamsters and securing signatures of members (seventeen in all including Maynard) to authorization cards furnished by Teamsters. The record justifies the inference that Sellers was aware of such activities and attitudes on April 1st and prior to their discharge on April 2nd. Also to be considered is the close coincidence of such activities and their discharge. While the record is clear that Respondents had been dissatisfied for some time with the manner in which Maynard performed his duties, and intended to discharge him when a replacement had been trained, we are satisfied that he was discharged at the time he was, not because of his unsatisfactory

performance of his duties but because of his actions and attitudes in opposition to the Union.

As above noted, the Board agreed with the Trial Examiner that the Respondents unlawfully assisted the Union but did not adopt his conclusion that domination was established. The Board relied upon the unquestioned practice of Respondents' clerk in handing Union authorization and checkoff cards to new employees when they first reported for work; the participation by management representatives in the Union's meetings; the fact that a management representative, Hendricks, was an officer of the Union and engaged in negotiations with the Employer; and Respondents' conduct in impressing upon its employees that only the Union was acceptable as a bargaining agent. We attach no significance to the practice of Respondents' clerk in handing Union authorization and checkoff cards to the new employees when they first reported for work. In this connection the Trial Examiner stated: "The fact that employees upon hire were given an application card for Bottlers [Union] might in other circumstances be innocuous, but here that fact constitutes just another facet of Respondents' support of that organization. Respondent was soliciting members for an organization under its domination and control." It is to be remembered that the Board rejected the Trial Examiner's conclusion that domination by Respondents was established. In addition, it should be noted that membership in the Union was limited to employees of Respondents. On this same matter the Board, in its decision and order, stated: "However, there is no evidence that any managerial or supervisory personnel was aware of the clerk's acts in distributing the cards, that the clerk told new employees that signing the cards was a prerequisite to being hired, or that the Respondents otherwise aided the Union in obtaining members."

We find little, if any, support in the record to support the Board's conclusion that Hendricks, an officer of the Union, engaged in contract negotiations with the employer, on behalf of the Union, as a management representative. Hendricks had the title of "Special Representative". He issued uniforms to the route drivers and handled some collections, and on rare occasions he appeared for the Respondents in the Small Claims Court. He had no employees of Respondents under him except each fall when the California State Fair is held in Sacramento [duration of 12 days], Hendricks, acting for C-C Concessions, Inc., one of the business entities comprising the Respondents, employed and later terminated the "coke hustlers" who pass among the crowd selling coca cola. The record is clear that such "coke hustlers" were never members of the Union. Admittedly Hendricks was a member of the committee for the Union in contract negotiations with Respondents. In its decision and order the Board stated: "Finally, Hendricks was elected to his post on the Negotiations Committee and there is no evidence that the Respondent participated in his selection in any way."

The Board's conclusion that management representatives participated in the Union's meetings is based upon the Trial Examiner's finding that Baxter, Glaser, Di Renzo, Van Natta and Hendricks "spoke with the voice of management." In its decision and order the Board stated: "In addition, the management representatives who participated in the Union were in the lower echelons of the Respondents' hierarchy and were considered to be within the unit." Neither the Board nor the Trial Examiner found or concluded that any one of those individuals was a "supervisor" within the meaning of the term "supervisor" as defined in the National Labor Relations Act.

The Board, in its brief, cites two "voice of management" incidents occurring in Union meetings. The first relates to the Union meeting held on March 21, 1963. As stated in the Board's brief:

"During the meeting, Bottlers' [Union's] President Silver, expressed the view that the employees should not 'ask for anything that is too ridiculous, because whatever Mr.

Sellers agrees on, that's all he is going to say'. Lechner, surprised, requested Silver to repeat his statement. Silver said, 'Well, whatever Mr. Sellers says goes like this.' Lechner replied, 'Well, what are we doing here. Why waste our time?' Lechner thereupon walked out of the meeting."

It is to be noted that there is no contention made that Silver was a management representative or "spoke with the voice of management."

The other incident relates to the meeting held on April 1, 1963. As stated in the Board's brief:

"At about 9:30, the drivers, along with District Managers Glaser and Baxter and Route Managers Van Natta and DiRenzo, entered the VFW Hall for a meeting of the Bottlers [Union], which was presided over by Secretary-Treasurer Hendricks and President Silver. At the meeting, Lechner requested Hendricks to read the contract. Hendricks did so. Lechner asked for the floor and requested a postponement of 72 hours in order to permit further study of the proposed contract before the employees voted. Lechner claimed that the contract 'was just dropped in our laps, we come to work, just dropped in our laps, sign it or don't go to work.' Hendricks replied, 'Well, I am reading it to you, aren't I?' Lechner requested a vote on his proposal for a 72-hour postponement. District Manager Baxter said, 'Lechner, maybe you can afford to miss 3 days work, I can't. Jack [Sellers] has already said we are not going to work until we sign it. Let's not waste time, sign the contract and get to work'. A vote was then taken on Lechner's motion. A majority of the employees, including Baxter and Van Natta, voted against the motion, and for immediate consideration of the proposed contract. One of those supporting Lechner's motion in a standing vote was Leon Maynard. The latter also supported Lechner vocally throughout the meeting. A secret ballot was then taken on the proposal to approve the contract. While the ballots were being counted, Lechner walked up to the desk where the votes were being recorded and observed that 12 proxy votes had been cast on behalf of accepting the contract. Lechner, supported by Maynard, protested that it was unfair to count the votes of men who were not present at the meeting, calling it 'undemocratic.' Hendricks answered that the inclusion of the proxy votes was without significance since, in any event, the proposal to accept the contract had been approved by a majority of the employees present. The meeting then ended."

The Board's brief then characterizes said meeting in the following terms:

"Then, after in effect dictating the terms of a new contract to Bottlers' [Union's] officials whose main spokesman was a management representative, respondents gave the employees no opportunity to consider its adoption in an atmosphere free of employer influence. For, using their membership in the Bottlers, the District and Route Managers and Special Representative Hendricks both participated and officiated at the union meeting and imposed respondents will on the employees by quickly implementing the adoption procedure and echoing General Manager Sellers' declaration that failure to accept the contract immediately would result in loss of work."

The vice in the extravagant statement of the Board is the unwarranted assumption that Hendricks was speaking for management and that Baxter was speaking in the interest of Respondents rather than, as his words made manifest, in his own interest.

■ Our study of the entire record convinces us that the weight of the evidence is against the finding or conclusion

of the Board that the Respondents unlawfully assisted the Union by participation in union meetings of representatives of management, and we cannot conscientiously so hold in the light that the record in its entirety furnishes. We do, however, hold that Respondents unlawfully assisted the Union by their conduct in impressing upon their employees that only the Union was acceptable as a bargaining agent for their employees. In our view such finding or conclusion is supported by substantial evidence. When Sellers learned that the Union was to hold a meeting on Monday morning, April 1, 1963, Sellers stated:

"A  Well, I decided that if they were going to have the meeting, I felt that I should avail myself of the opportunity to present the contract, the terms and conditions, to the people before they met on their own, and my whole purpose in having a meeting was to read over the contract and explain the terms and conditions of the contract.

Q  And did you call such a meeting?

A  Yes, I did.

Q  And was that for Monday morning?

A  Yes.

Q  The first of April?

A  The first of April.

Q  And was that the meeting that has been described?

A  Yes.

Q  That took place at the plant in the party room, I believe?

A  Yes.

Q  Who attended that meeting?

A  All the members of the union.

Q  Did Mr. Taylor or Mr. Dal Porto attend?

A  No, they did not.

Q  Were any of the other management personnel there other than yourself?

A  No."

\*     \*     \*     \*     \*     \*

At the meeting Sellers stated:

"A  Well, as I say, I reviewed the contract, went over all the terms and conditions of the contract, and at the same time I told the people that we no longer had a contract, that our contract had expired on March 31st, and this was April 1st, and I felt that we should have a contract to protect both them and myself, and that this contract represented the very best that I was able to offer them.  This was my top and final figure.

\*     \*     \*     \*     \*     \*

I also told them that I wanted them to go down to the Veterans Hall and to read the contract and to give it every consideration and to make up their minds whether they were going to accept or reject it, and those that wanted to accept this contract, they were most welcome to come back to work and those that didn't want to, the doors swung both ways, because this was the best that I could do.

\*     \*     \*     \*     \*     \*

I never issued any threat they would lose their job.  My statement was to the effect that if they did not like the contract, they didn't have to work for us, but I wasn't forcing them to work under it.

\*     \*     \*     \*     \*     \*

I said that I recognized the Bottlers Union as the bargaining agent and that they represented the employees and that I wanted to do business with them and with nobody else, because I felt that they represented my employees and I have no objection to doing business with my own employees, but I did not desire to do business with outsiders.

Q  Did you make any reference to any specific other unions in the course of that talk there that morning?

A  I may have, but I do not recall.

Q Do you recall whether you specifically mentioned Teamsters at that time?

A I may, but I do not recall."

While Sellers testified he was unaware at the time of his talk that there had been some activity on behalf of the Teamsters among his employees, we see no reason why he should have made statements concerning "outsiders" or the "Teamsters" unless he had some knowledge of Teamster activity among his employees.

Finally, we consider the Board's findings that Respondents violated Section 8(a) (1) of the Act by interrogating and threatening their employees concerning their union and protected activities. As above indicated, applicants for employment with Respondents and those considered for promotion were interviewed at the office of "White", which firm was retained by Respondents to conduct pre-employment interviews and background screening.

At the hearing before the Trial Examiner five witnesses who were employees or former employees of Respondents testified that White had asked them questions about their union affiliation and sympathies during pre-employment interviews.

White testified that he was given no instructions by Respondents with regard to the conduct of the interviews, and that no question regarding union affiliations or sympathies was asked but that such information was often volunteered by applicants in response to general questions. One witness testified that White first mentioned the word "Union".

■ Sellers testified that his company had retained White to help screen out dishonest persons, those with bad driving records, and to assist in selecting the highest quality personnel possible. He testified that he had never given White directions to develop information from applicants for employment concerning their attitude toward unions. Of the five interviewed, four were applicants for employment. The fifth one was interviewed twice,—once while an applicant for employment, and the other time when being considered for possible promotion. We note that Section 8(a) (1) of the Act provides that it "shall be an unfair labor practice for an employer to interfere with, restrain, or coerce *employees* in the exercise of the rights guaranteed in Section 7." (Italics ours.) There is no mention either in Section 8(a) or in Section 7 relating to applicants for employment. We need not decide whether applicants for employment may be restrained or coerced in the rights granted by Section 7 because we are unable to conscientiously say that the finding and conclusion of the Board is supported by substantial evidence when viewed in the light of the entire record. The mere act of questioning employees concerning union membership is not, per se, unlawful. Salinas Valley Broadcasting Corporation v. N. L. R. B., 334 F.2d 604 (9th Cir. 1964).

Aside from the bare finding of interrogation, the Trial Examiner adverts to nothing in that regard to support a finding of an Unfair Labor practice within the meaning of Section 8(a) (1). It appears to us that the interviews by White were for a bona fide purpose on the part of the employer. It does not appear that the purpose was to develop information concerning union activities. We see no coercion.

The Board's petition for enforcement of its order is granted only in a manner consistent with the views expressed in this opinion, and counsel for the Board is directed to prepare and file, within fifteen days from the filing of this opinion, a form of enforcement order consistent with the views herein expressed and counsel for Respondents are granted fifteen days after the filing of said proposed order in which to file written objections thereto.