325 So.2d 642 (1975)
Carl Dean OGAARD and Valorie Clayton, Plaintiffs-Appellees,
v.
Gus O. WILEY et al., Defendants-Appellants.
No. 5243.
Court of Appeal of Louisiana, Third Circuit.
December 24, 1975.
Rehearing Denied January 30, 1976.
*645 Gold, Hall, Hammill & Little by Leo Gold, Stafford, Pitts & Stafford by John L. Pitts, Lewis O. Lauve, Gist, Methvin & Trimble by James T. Trimble, Jr., Alexandria, Sam J. Friedman, Natchitoches, for defendants-appellants.
Gravel, Roy & Burnes, by Chris J. Roy, Alexandria, Roy Maughan and Dorsey Martin, III, Baton Rouge, Alfred Mansour and Edward A. Kaplan, Pharis & Pharis by F. Jean Pharis, Alexandria, Watson, Murchison, Crews & Arthur by William P. Crews, Jr., Natchitoches, for plaintiffs-appellees.
Before MILLER, WATSON and CUTRER, JJ.
MILLER, Judge.
Defendants appeal a judgment awarding $35,000 to plaintiff Carl Ogaard and $42,190.96 to plaintiff Valorie Clayton as damages for the wrongful death of their daughter, Kathleen Laurel Ogaard, a guest passenger in a pickup truck driven by Mrs. Martha Meaux. Mrs. Meaux's husband is a co-plaintiff in a consolidated suit. We affirm.
This suit was consolidated with six others for trial and appeal. Kathleen was one of fourteen people riding in the cab or bed of a pickup truck which was rear-ended by defendants' truck and tandem trailer with a gross weight of 82,650 pounds. Kathleen was one of twelve persons killed in the accident. The other two claimants survived and the seven consolidated suits involve all claims resulting from the accident.
Defendants are Gus O. Wiley, who was driving the tandem truck; his employer T(ommy) Robert, owner of the tandem truck; their insurer, National Fire & Marine Insurance Company; Alexandria Mill & Grain Elevator, Inc., as alleged employer of Wiley; the Mill's insurer, Hartford Accident and Indemnity Company; Saline Lake Farms, Inc., on the allegation the Mill is Saline's alter ego; and Saline's insurers, its primary insurer Travelers Insurance Company, and its excess limits insurer, Mission Insurance Company.
At trial there were five basic issues: 1) was Wiley liable; 2) was Wiley an employee of the Mill, either directly or pro hac vice; 3) was the Mill an alter ego of Saline; 4) did Mission's policy afford coverage to the Mill when the accident occurred; and 5) quantum?
The trial judge assigned written reasons, holding: 1) Wiley was negligent and his negligence was the sole proximate (legal) cause of the accident; 2) Wiley was the *646 pro hac vice employee of the Mill; 3) the Mill and Saline were alter egos; 4) Mission's umbrella (excess) coverage was applicable only through liability of Saline; and 5) assessing the quantum to be awarded each plaintiff.
Mrs. Martha Meaux was driving the pickup truck south on U.S. 165 between Glenmora and Oakdale on her way to take twelve children and one other adult to a swimming party. Wiley had been following the pickup for some time at a speed of 45 to 50 mph. For a minute or so before the accident the tandem truck had been followed by two passenger vehicles and the occupants of these vehicles testified as independent eye-witnesses. Mrs. Meaux planned to turn right onto a gravel road and turned on her turn signals as she approached the intersection. Wiley also turned on his right turn signal blinkers. At a point when both vehicles were in the southbound lane, the front of Wiley's truck struck the rear of the pickup. This occurred about seventy feet from the point at which the pickup could have commenced its turn onto the gravel road. The tandem truck's front wheels were lifted from the road surface and rode up the rear of the pickup until the pickup struck a large tree 271 feet from impact. The pickup was crushed between the tree and the tandem truck. Bodies of some of the occupants were found crushed at the scene and others were along the vehicles' route.
The threshold issue relates to the liability of defendant Wiley. The liability of all others is derivative.
Defendants rely on the doctrine of sudden emergency for exculpation from liability. Wiley testified the pickup's right front wheel dropped off the right side of the road; the pickup then veered to the left and crossed the centerline of Highway 165; then went entirely off the road on the right shoulder again; and then, completely out of control, came back on the road immediately in front of him at impact. Tr. 391-410. Wiley contends the collision was unavoidable.
Eye-witnesses and supporting physical evidence indicate the pickup was in its lane of travel at impact. Tr. 387, 391, 439, 481, 510, P-16, P-19. No evidence supported Wiley's version that the pickup left the road. Witnesses in the following vehicles testified they were alert and looking because of the turn signals flashing on the pickup and tandem trucks. They testified the pickup did not leave the road or cross the centerline prior to impact. There is no manifest error in the trial judge's acceptance of this testimony.
By Wiley's own testimony the trial judge properly found his negligence caused the accident. Wiley testified he was attempting to pass the vehicle which he thought was out of control and his decision to pass was made while the pickup was moving forward. Under these circumstances a reasonable and prudent driver should not attempt to pass the preceding out of control vehicle by driving in the same lane even though the lead vehicle left the road and was entirely on the right shoulder.
Appellants have failed to establish manifest error in the trial court holding Wiley's negligence to have been the sole cause of the accident.

WAS WILEY EMPLOYED BY THE MILL?
At the outset defendants seek to overturn the trial judge's finding that Wiley was the Mill's employee. The Mill, Saline, and their insurers contend there has been a judicial confession (by defendants admission in its answers the allegation that Wiley was T. Robert's employee) that Wiley is the employee of T. Robert; and that this judicial confession precludes argument that an employment relationship existed between Wiley and any other party. We reject that contention.
*647 The employment relationship between Wiley and Robert is uncontested. However, plaintiffs alleged the Mill and Saline were also Wiley's employers when the accident occurred. The allegation and admission that Wiley was employed by Robert would defeat the allegation (of Wiley's employment) by the Mill and Saline only if the two allegations are irreconcilable. They are not.
We find Wiley to have been a Mill employee for these reasons. The owner of the tandem truck, T. Robert, was the son of the managing director of the Mill who was also one of the key managers of Saline. T. Robert's father informed the Mill manager, Mr. Haynes, that T. Robert was to be used for all hauling that could be handled by one truck. When more trucks were needed, T. Robert's truck was to be the first one called. This was rigidly followed for more than a year. Wiley would bring all records of his hauling to the Mill, and the Mill maintained the only records of Wiley's hauling. Each month the Mill calculated (from records turned in by Wiley), the amount due to Robert and would send a check to T. Robert. T. Robert would, in turn, make out his check for 20% of that amount as Wiley's pay. Although the Mill did not withhold income tax and social security, neither did Robert. Tr. 320.
Wiley had a key to the Mill gatethese keys were provided only to Saline's employees. On the alter ego issue, infra, Saline and the Mill are one and the same. The Mill called Wiley to report for hauling, told him when to load, how much, and where to go. On occasion, the Mill directed Wiley to pick up grain in Saline's fields and deliver it to the Mill. The only hauls made by Wiley for parties other than the Mill were those arranged by the Mill. The hauling agreement was terminable without notice. Advances were made by the Mill to Wiley, and later withheld from the Mill's payment to T. Robert. These arrangements were not extended to other drivers.
T. Robert was totally dependent on the Mill to determine the hauling for which he was paid, and the amount of money due. All original records, logs and tickets were delivered to the Mill. Tr. 312, 3, 9, 421. This is inconsistent with the Mill's contention that each haul was a separate verbal contract between the Mill and T. Robert.
The principal evidence denying the employment relationship between T. Robert and the Mill was that of the Mill's manager at the time of the accident, Mr. Haynes. Haynes could not recall T. Robert's father talking with him about a hauling agreement, and testified each haul was a separate contract. Mr. Haynes testified that although he had authority to call other trucks, he admitted he knew T. Robert was to be favored and stated he was uniformly favored. Tr. 691.
The trial court accepted the testimony of T. Robert and his father and rejected that of Haynes. Furthermore, T. Robert's father was Haynes' superior and his understanding of the Mill's agreement determined the nature of the contract. The trial court correctly concluded there was an arrangement between T. Robert and the Mill other than that of an independent contractor.
In summary: T. Robert had an agreement with the Mill that his truck would get all hauling that could be handled by one truck, and when more trucks were needed, his truck would be called first. T. Robert kept no records. He was completely dependent on the Mill to receive and hold original trip records and to determine his compensation. His truck was to be available at all times to the Mill and the driver was to be instructed by the Mill as to when and how much he was to haul from point to point. The Mill determined the origin and destination of each shipment. Occasionally, the Mill directed Wiley *648 to pick up grain in Saline's fields and deliver it to the Mill. Under these circumstances T. Robert was not an independent contractor, but an employee. He was employed by the Mill to furnish a service. Therefore Wiley was also the Mill's employee.
Although we agree with the relevant facts stated in the trial judge's written reasons, we differ with his conclusion that Wiley was the pro hac vice employee of the Mill. Wiley was instead an employee of the Mill. Appellants have failed to establish manifest error in the result reached by the trial court.
Since we find Wiley to be the Mill's employee, we do not reach the pro hac vice employee issue.

ALTER EGO
The trial judge held (and one of Saline's insurers conceded in appellate argument, the other denied) the Mill was Saline's alter ego at the time of the accident. There is no manifest error in the trial judge's holding.
The Mill was capitalized at $1,000. Its principal assets (property, improvements and machinery) were acquired by donation from persons who became the Mill's principal officers and who are major shareholders in the Saline corporation. These officers had absolute authority to run both corporations. The Mill was not expected to make a profit. It accepted grain from a few farms other than Saline's in order to lower overhead. The Mill was acquired to provide additional storage for Saline when a merger by Saline with another corporation dramatically increased the size of Saline's farming operations. The two corporations had the same post office box. Money borrowed in one corporation's name was transferred to the other's account, "not really borrowed but, it was just used." Tenants of Saline were required by the terms of their lease to use the Mill.
Since the Mill was the alter ego of Saline Lake Farms, Inc. at the time of the accident, Saline is also liable, together with the Mill, for the tort of its employee Wiley.

APPORTIONMENT BETWEEN INSURERS
Since Wiley has been held liable, the insurer of the tandem truck, National Fire, admits its liability up to its $40,000 policy limits. Since Wiley has been found to be an employee of the Mill, Hartford, the Mill's insurer, admits its liability up to its $300,000 policy limits.
A dispute over apportionment exists between Travelers, Saline's primary insurer, and Mission, Saline's umbrella or excess limits insurer.
Travelers contends all the Mill's resources ought to be exhausted before Travelers should contribute and Mission's coverage was part of those resources. This claim is based on language in Mission's policy regarding subsidiary or owned corporations of Saline "as now or hereafter constituted and of which prompt notice has been given to underwriters."
Travelers contends this language in Mission's policy provides automatic coverage for new corporations acquired by the original named assured, Saline; that the only reason notice is required to Mission is to provide a vehicle for adjusting premiums due Mission. The trial judge rejected this argument and Travelers has failed to establish manifest error.
The quoted language allows Saline to provide coverage for new acquisitions on reasonable notice without rewriting the policy. The trial court's holding is in line with the plain meaning or most evident intent of the insurance contract.
The quoted language, which is at issue here, appears in the clause defining the named insured. To the extent coverage *649 is limited by that definition it has the effect of a condition on the contract. Notice may be a condition precedent or a condition subsequent, but in either event it has the effect of a condition. Unless the condition is fulfilled, there is no obligation in force. We are not required to decide what kind of condition this is, because the trial court found no notice was given, prompt or otherwise. Therefore, Mission's contract with Saline did not provide coverage to the Mill.
Since Mission is not an insurer of the Mill except through its coverage of Saline, we do not decide the contention that it would "come before" Travelers in apportionment of the damages.
Travelers contends this finding of no actual notice is not decisive because Bates, the agent for Mission, had constructive notice of the acquisition of the Mill by Saline. This is based on Bates' ownership interest in one of the larger owners of Saline's stock, AMI, Inc., and Bates' position as a director of AMI. At the time of this accident, AMI was a general partner with Saline and a major shareholder therein.
T. Robert was an executive officer of both Saline and the Mill. He testified that acquisition of the Mill was placed before Saline's annual stockholder's meeting. It was also established that some of Saline's business was discussed at AMI's board of directors meetings, some of which Bates attended.
However, Bates specifically denied knowledge of Saline's acquisition of the Mill. There is no manifest error in the trial court's conclusion that Bates individually did not have actual knowledge of Saline's acquisition of the Mill. Since Bates had no actual knowledge, we do not reach the question of the effect of personally acquired knowledge of an agent on his employer.
Travelers then contends Bates had constructive knowledge of Saline's acquisition of the Mill; and that constructive knowledge of an agent may be imputed to the insurer, just as actual knowledge of the agent was imputed to his company in Tarver v. Peoples Fire Insurance Company of New Orleans, 6 Orl.App. 59 (La.App.Orls.Cir.1908).
To adopt this reasoning we would impute to the agent and through him to the insurer such knowledge as he could have obtained through a reasonable investigation where he knew facts which put him on inquiry (notice). See Bailey v. American Marine & General Insurance Company, 249 La. 98, 185 So.2d 214 (1966). Travelers extends this logic one step further and argues Bates should have learned of facts which would have put him on inquiry.
The relationship of AMI to the Mill seems too tenuous to require a director of AMI to have a duty to know of Saline's acquisitions, particularly on the part of one who is not a managing director. But if it did, the duty of an insurance agent does not encompass his sniffing out chance information that might benefit his employer. There is no basis for finding constructive knowledge in Bates' position with AMI.
Travelers also contends Bates may have had occasion to acquire such knowledge in the course of his business through his agency's annual review of Saline's records. But, he testified the review was in fact made by his office staff. The acquisition of the Mill was not discovered in the performance of this review. Nor were facts discovered in the review which should have put Bates on inquiry. There is no suggestion that the procedure for the review was inadequate. The review presents no basis for finding constructive notice to Bates, Mission's agent. Mission Insurance Company was therefore not an insurer of the Mill.
Alternatively, Travelers argues their policy provisions for hired or nonowned vehicles limits coverage to excess coverage, and therefore Travelers is not *650 the primary insurer of Saline insofar as this accident is concerned. We reject this contention.
Travelers relies on Section VI of its Comprehensive Automobile Liability Insurance Coverage [VI. Additional Condition: Excess InsuranceHired and Non-Owned Automobiles]. The relevant clause provides:
With respect to a hired automobile or a non-owned automobile, this insurance shall be excess insurance over any other valid and collectible insurance available to the insured. [Emphasis added.]
Although Travelers provides two distinct types of coverage in its policy, it does not for that reason acquire the right to decide which coverage applies. The facts and circumstances of this case determine the liability of Saline, Travelers' insured. Travelers is then liable under the coverage which is responsive to the nature of Saline's liability.
Saline's liability here is that of an employer for the tort of its servant. This coverage is provided by Travelers' comprehensive general liability insurance coverage. That section contains no provision regarding other collectible insurance.
Travelers' liability in this case falls under the general conditions of its policy which provides:
6. OTHER INSURANCE: The insurance afforded by this policy is primary, except when stated to apply in excess of or contingent upon the absence of other insurance ....
The apportionment section of this clause is not here pertinent because the liability exceeds the combined limits of all policies available as primary insurance.
The apportionment of the judgment to Travelers to the limit of its policy is therefore correct. Liability in excess of the combined policies of Wiley's insurer (National Fire), the Mill's insurer (Hartford), and Saline's primary insurer (Travelers), was properly assessed to Saline's excess insurer Mission Insurance Company.

LIABILITY OF T. ROBERT INDIVIDUALLY
The trial court dismissed all claims against T. Robert, owner of the truck Wiley was driving. Plaintiffs did not appeal from that judgment. They only answered the appeals by Wiley, the Mill, Saline, and their insurers. An answer to an appeal has the effect of an appeal only as to appellant(s) and therefore, appellees cannot secure relief as against T. Robert who has not appealed. LSA-C.C.P. art. 2133; Vidrine v. Michigan Millers Mutual Ins. Co., 242 So.2d 249 (La.App. 3 Cir. 1971).
The judgment dismissing T(ommy) Robert is therefore final and the matter of T. Robert's liability is not before us.

COSTS OF COURT
The trial judge taxed costs proportionately among all defendant insurance companies which were cast in damages. LSA-C.C.P. art. 1920 authorizes such action. We reject the contention that costs of court must be paid by only one insurer or by only the primary insurers in accordance with policy provisions. The trial court may render judgment for costs or any part thereof, against any party, as it may consider equitable. The apportionment appears equitable.

QUANTUMELEMENTS
At the outset, we reject defendants' argument that grief is the only element of general damages present in cases of the death of children. It may well be the most substantial element. While it is true that awards are not made for value of lost monetary support in the case of children unless actual monetary support has *651 been shown, it is recognized that in addition to the grief endured, the parents are entitled to recover for their deprivation of love, affection and companionship. Lopitz v. Louisiana Department of Highways, 268 So.2d 269 (La.App. 4 Cir. 1972); Himes v. Avinger, 85 So.2d 304 (La.App. 2 Cir. 1956).
There is seldom, if ever, an attempt to segregate various elements of general damage and make an award for each item. Nevertheless the peculiar facts related to each item must indicate support for the total award.
The scope of appellate review of quantum is limited to essentially two issues. First, is there manifest error as to facts supporting the award or elements thereof? Second, has the trial judge abused the "much discretion" granted to trial courts by LSA-C.C. art. 1934(3)?
To make the determination of abuse the court must consider the specific facts established in the record, the relationship of the parents to their child or children. See dissent in Sylvester v. Liberty Mutual Insurance Company, 237 So.2d 431 at 432 (La.App. 3 Cir. 1970). Seemingly similar cases are relevant only as they indicate the award is not so greatly disproportionate to prior awards as to constitute an abuse of the trial court's discretion. Luttrell v. State Farm Mutual Automobile Insurance Company, 244 So.2d 97 (La.App. 3 Cir. 1971). Both concepts were approved in Anderson v. Welding Testing Laboratory Inc., 304 So.2d 351 (La.1974).
Although the awards in this case equal and in the case of one mother exceed the highest prior award approved by a Louisiana appellate court for the wrongful death of a child, the difference here is not so great that we find the disproportion with prior awards to indicate an abuse of discretion.
Kathleen Laurel Ogaard was shown to be a cheerful, affectionate, helpful and loving daughter. She was fourteen years old, deaf, and had difficulty with her speech. Her deafness did not appear to encroach significantly on her mental acuity, her social activity and concern. She was the youngest child and the last living at home with her mother. There are no children of her mother's second marriage. During the school term, Kathleen, of necessity, was sent to the School for the Deaf in Baton Rouge. She was brought home almost every weekend. She was at home during this summer vacation learning to cook and sew. There was a special relationship existing between Kathleen and her mother often found between handicapped children and their mother. On these facts, we find the award of $40,000 to the mother for loss of her daughter to fall within the trial court's "much discretion."
Mr. Ogaard answered the appeal seeking an increase in the $35,000 awarded him to $40,000. He has provided child support payments to her since his divorce ten years before Kathleen's death. He exercised visitation rights granted to him in the divorce decree during each of the ten years. Kathleen spent a substantial part of each summer with her father. He testified to Kathleen's cheerful, affectionate and helpful behavior.
Mr. Ogaard's visits to Kathleen during the school year were infrequent. He has an eight year old daughter by his second marriage. On the facts, the $35,000 awarded is on the high side, but is neither excessive nor inadequate.
The trial court judgment is affirmed at appellants' costs.
Affirmed.

ON APPLICATION FOR REHEARING
The applications for rehearings convince us that we erred in affirming the trial court's taxing all interest on the judgments proportionately to all insurers. The *652 applications point to policy provisions expressly providing to the contrary as to interest accruing after judgment is entered (signed).
Although the policy provisions apply to court costs in the same manner as interest, we reject the contention that only primary insurers should be taxed with court costs. LSA-C.C.P. art. 1920 grants discretion to the trial court to apportion costs and his apportionment is equitable.
National Fire and Marine Insurance Company, Hartford Accident and Indemnity Company, and Travelers Insurance Company have substantially similar policy provisions providing for supplemental payments (above and beyond their policy limits) which obligate the insurer to pay:
all expenses incurred by the company, all costs taxed against the insured in any suit defended by the company and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon.
Mission Insurance Company's policy defines "excess" for which Mission is responsible. That section of Mission's policy expressly excludes interest "when such expenses are included in other valid and collectible insurance."
A similar provision has been interpreted to excuse the excess insurer from liability. Richardson v. Tate, 269 So.2d 278 (La.App.4th Cir., 1972). There the "excess" insurer was relieved of liability for interest for which the primary insurer was liable.
Hartford and Travelers were excess insurers with respect to National Fire's coverage of Wiley. In recognition of its policy obligation (similar to Hartford's and Travelers') National Fire has paid the full amount of its policy limits on the judgments together with interest from the date the judgments were signed through June 6, 1975 on the entire $800,000+ awarded in the judgments.
Although Hartford and Travelers are secondary insurers as to National Fire, they are both primary insurers as to Mission. Each provides primary coverage with policy limits of $300,000. Under terms of their policies, they are responsible for ". . . all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon."
Interest which accrued on the judgments after entry of those judgments is not part of the "excess" for which Mission is liable, and we erred in affirming the trial court's assessing a portion of that interest to Mission.
Interest which accrued from date of judicial demand until entry of judgment was properly apportioned to the different insurers.
We amend our prior decrees to recognize that National Fire paid interest on all judgments from the date the judgments were signed until it paid its policy limits, and to assess all legal interest which accrues on the judgments from June 6, 1975 to defendants Hartford and Travelers. Should Hartford and Travelers satisfy their liability on the judgments, Mission would then be liable for interest accruing thereafter.
With these amendments, all applications for rehearing are denied. All parties are hereby granted leave to file additional applications for rehearing relating to these amended decrees.
Amended and affirmed.