377 So.2d 465 (1979)
Anthony P. ABRAHAM
v.
LAKE FOREST, INC. and N. E. I. Corporation.
No. 10369.
Court of Appeal of Louisiana, Fourth Circuit.
November 8, 1979.
Rehearing Denied December 17, 1979.
Writ Refused February 15, 1980.
*466 Frank J. D'Amico, New Orleans, Robert B. Bieck, Jr., Jones, Walker Waechter, Poitevent, Carrere & Denegre, New Orleans, for plaintiff-appellant.
Daniel Lund and Brian T. Leftwich, Montgomery, Barnett, Brown & Read, New Orleans, for defendants-appellants.
Before SAMUEL, REDMANN and SCHOTT, JJ.
SCHOTT, Judge.
After taking a judgment against NEI Corporation, Alabama (hereinafter referred to as "Alabama") plaintiff brought this suit against Lake Forest, Inc., the owner of all of the stock in Alabama and NEI Corporation, the owner of all of the stock in Lake Forest, attempting to pierce Alabama's corporate veil and to make the other corporations liable for Alabama's debt. Plaintiff has appealed from a dismissal of the suit and raises the issue that the facts and circumstances support the imposition of liability on Lake Forest and NEI as a matter of law.
On March 14, 1973, plaintiff purchased for $21,524 an option to purchase some 119 acres on Cody Road near Mobile, Alabama, for $389,382.50. Shortly thereafter plaintiff began to negotiate with a representative of Lake Forest to sell the option. These negotiations culminated with a sale and assignment of the option by Abraham to Lake Forest's newly formed subsidiary *467 Alabama for $375,500. On the same date Abraham and Alabama jointly exercised the option to purchase the property and Alabama subsequently took title to the property for $389,382.50.
The price Alabama paid for the option consisted of $172,117.50 in cash paid to Abraham and his partner, and Alabama's note for $203,382.50. Between March 14, 1974, and January 10, 1975, payments amounting to $50,845.64 on the principal were made, leaving a balance of $152,536.86, the amount of the judgment taken by Abraham against Alabama and the amount sued on in this case, plus accrued interest.
In connection with Alabama's purchase of the property it borrowed $550,000 from the First National Bank of Mobile, secured by a mortgage on the property. Its plans to develop the property into 385 residential sites and 14 acres of commercial property did not materialize and Alabama sold the property on November 4, 1975, for $490,000. After deduction of the mortgage balance and the closing costs Alabama received $33,185.36. It is Alabama's disposition of this sum which creates one of the principal issues raised by plaintiff and which will be discussed in detail hereafter.
NEI Corporation, one of the defendants in this case, is a large public corporation engaged in the real estate development and management business throughout the United States. It operates through numerous wholly owned subsidiaries, some of whose stock such as Lake Forest it directly owns while the stock of others, such as Alabama, is owned by other subsidiaries, such as Lake Forest in this case. Alabama was incorporated for the immediate purpose of acquiring the property on which Abraham had the option and for the long range purpose of developing that property residentially and commercially. It was incorporated with the minimum of $1,000 paid in capital and never generated any revenues of its own. All of the funds in excess of those realized by Alabama when it sold the property in November, 1975, were advanced by Lake Forest. This amounted to about $290,000 including the $172,117.50 originally paid by Alabama to Abraham and his partner, the $50,845.64 paid on the principal of the note held by Abraham, and interest payments amounting to $22,783.61. Although Alabama had its own bank account these transactions were handled by Lake Forest, but complete accounting records were kept to reflect that they were loans being made by Lake Forest to Alabama. Any operating expenses incurred by Alabama were likewise paid by Lake Forest with appropriate accounting entries made to show these as loans to Alabama. When Alabama sold the property the net proceeds of $33,185.36 were represented by a check payable to the order of Alabama, and although the check was endorsed by Alabama it was deposited in the Ohio bank account of NEI Corporation. Accounting entries were made in the books of Alabama showing its receipt of the funds, its payment of the funds to Lake Forest, and reduction of Alabama's debt to Lake Forest. Lake Forest's books reflected its receipt of the funds on account of Alabama's indebtedness and its payment on account of its indebtedness to NEI Corporation.
In the management of the corporate affairs of NEI, Lake Forest and Alabama, separate boards of directors and slates of officers were elected and separate minutes of meetings of the boards were maintained, although the same individuals for the most part sat on the boards and held office in each of the corporations.
Plaintiff argues primarily that he is entitled to the judgment against Lake Forest and NEI because Alabama is the alter ego and a mere business conduit of the other corporations. Alternatively, plaintiff contends that the receipt of the $33,185.36 by NEI from the sale of the property by Alabama constituted an unlawful dividend or distribution of assets under LSA R.S. 12:93D so that NEI and Lake Forest are liable to plaintiff for at least this amount.
Plaintiff's primary argument rests on legal principles recently considered by this court in Dillman v. Nobles, 351 So.2d 210 (La.App. 4th Cir. 1977) where the following *468 analysis was given: As a general rule a corporation is a distinct legal entity whose shareholders are not individually liable for its debts. However, this rule admits of the "alter ego" exception which, in turn, is supported either by a fraud or deceit practiced on a creditor by the shareholder acting through the corporation or even in the absence of fraud when the business of the corporation has been conducted under such circumstances where corporate formalities have been disregarded to the extent that the corporation ceases to be distinguishable from the shareholders. Some of the factors to be considered are the commingling of corporate and shareholder funds, the failure to observe statutory formalities in connection with the transaction of corporate affairs, under-capitalization, failure to provide separate bank accounts and bookkeeping records, failure to hold regular shareholder and directors' meetings and ownership of all shares by a single shareholder. In this case the court concluded that the alter ego doctrine applied, and the shareholder was individually liable. The same result was reached by the courts in Smith-Hearron v. Frazier, Inc., 352 So.2d 263 (La.App. 2nd Cir. 1977) and Ogaard v. Wiley, 325 So.2d 642 (La.App. 3rd Cir. 1975).
However, although the court recognized these same principles in Kingsman Enterprises v. Bakerfield Elec. Co., 339 So.2d 1280 (La.App. 1st Cir. 1976) it reached the opposite result emphasizing that the separation of the corporate entity from its shareholders is the firmly established general rule and should be disregarded only in exceptional circumstances. The court went on to say:
"Appellant elicits partial facts from other cases as authority for finding that the corporations were the alter egos of Womack. However, this approach is inadequate because it fails to consider the totality of circumstances as is necessary in such cases."
The court repeatedly emphasized that the "totality of facts" in the case did not support the alter ego theory even though the plaintiff did establish a number of important factors tending to support the theory.
We have concluded that plaintiff in the instant case is in much the same position.
On plaintiff's side of the case, he established that all of Alabama's stock was owned by one shareholder, Lake Forest. In a sense it can be said that Alabama was under-capitalized in that it purchased property for $790,000 while having only $1,000 of capital stock. There was a commingling of funds in the sense that Alabama had practically no funds of its own, virtually all of the funds it used were put up by Lake Forest and/or NEI, and even the proceeds from the sale of the property were deposited in NEI's account and were never put into Alabama's bank account. Finally, almost all of the business of the corporation was accomplished by unanimous consent of the shareholders, which obviated the necessity of meetings of Alabama's shareholders and board of directors.
On the other hand everything Alabama did was in compliance with corporation law. Individuals are specifically authorized to assume only limited liability by setting up a minimally capitalized corporation. Furthermore, the law specifically authorizes the establishment of a corporation by a sole stockholder and the use of unanimous consent agreements among shareholders and directors in lieu of meetings. Since all of the funds paid to Abraham and his partner originated from NEI no practical purpose would have been served for NEI to write a check to Lake Forest, for Lake Forest to write a check to Alabama, and for Alabama to write a check to plaintiff with intervening deposits into separate corporate accounts. It was sufficient under these circumstances for the matter to be covered with bookkeeping entries. Separate minute books were kept, resolutions were adopted, elections were held, positions and offices were filled and all of the facets of a separate formal corporation were observed by Alabama.
In any event, even though plaintiff can isolate a number of factors which favor his position they lose their significance when considered as a part of the totality of facts *469 in this case. Plaintiff was a sophisticated real estate entrepreneur who was quite familiar with the practice of undertaking separate real estate developments through separate minimally capitalized corporations. In fact, he admitted that he himself utilized this practice in his own business. Although his initial negotiations were with Lake Forest's representative he knew several months before the option was exercised by Alabama that it would purchase the option from him. On October 1, 1973, plaintiff wrote a file memorandum to the effect that the note would be given by "Ala. Subsidiary N.E.I." In the option jointly exercised on October 10 by plaintiff and Alabama, plaintiff advised the sellers that he had assigned all of his rights under the option to NEI Corporation, Alabama. Finally, he voluntarily accepted the note on November 28, 1973, from Alabama alone.
In none of the cases cited by plaintiff where the corporate veil was pierced on the alter ego theory was there even a voluntary creditor, let alone one who was as knowledgeable and free to enter into a transaction as was the plaintiff in this case. For instance in the Dillman case, plaintiff was a tort victim and the court refused to shield the individual tort feasor behind a practically invisible and purely artificial corporation. In the Smith-Hearron case, the court constituted the activities of the shareholder as "machinations" and spoke of "fraud and chicanery" in connection with his dealings with the plaintiff. In the Ogaard case, the court dealt with a tort claim and again refused to shield shareholder of a corporation which hardly had any functions.
In the instant case the plaintiff made a business judgment which, at the time he accepted the note, seemed to be quite prudent. He had gotten appraisals on this property which indicated that it had a great potential and he was apparently convinced that Alabama could capitalize on the project. Needless to say, Alabama was equally optimistic because it and its parent corporations invested considerable sums in the purchase of the property. When plaintiff took the note he was obviously speculating on the success of the project itself and was not relying on the credit of the parent corporation. He was apparently satisfied to take the risk considering the fact that he stood to make a relatively quick profit on the option which he had purchased just six months previously. While we understand from the jurisprudence that it is not necessary to establish fraud in order to support the alter ego theory we are satisfied that the doctrine contains equitable features which require that the type of claim and the relative positions of the parties be considered before applying the doctrine. In the instant case, these considerations do not support the application of the theory.
Turning to plaintiff's alternate theory, he refers to R.S. 12:93D which provides as follows:
"Every shareholder who receives any unlawful dividend or other unlawful distribution of assets shall be liable to the corporation, or to creditors of the corporation, or to both, in an amount not exceeding the amount so received by him. An action to enforce this liability must be brought within two years from the date on which the unlawful distribution was received, and this time limit shall not be subject to suspension on any ground, nor to interruption except by timely suit."
Before reaching the merits of this contention we must first consider defendants' position that the issue was not properly before this court. Plaintiff made no specific allegation in his petition to the effect that he was seeking a judgment for the $33,185.36 as an alternative to his claim for the full amount due him on the note. This specific claim was made for the first time in plaintiff's brief to this court.
LSA-C.C.P. Art. 2164 provides:
"The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal."
In Summerell v. Phillips, 258 La. 587, 247 So.2d 542 (1971), the court stated that the phrase "upon the record on appeal" in this article was of major significance and concluded *470 that the Court of Appeal could grant relief not specifically sought only if the basic pleadings adequately support all relief ultimately granted in the judgment. This approach was reaffirmed in Morgavi v. Mumme, 264 La. 24, 270 So.2d 540 (1972).
In this case, plaintiff specifically sought recovery against defendants for the full amount of his judgment against Alabama. The disposition of the $33,185.36 was intimately combined with plaintiff's overall case based on the closeness of the association among the three corporations and their failure to separate their management and fiscal operations. The facts and law which may support plaintiff's claim for the lesser amount are closely related to the facts and law on which he relies for the application of the alter ego theory generally. Finally, his suit for the whole amount necessarily embraces the claim for a part of the amount he sought if he could not establish entitlement to the whole. Thus, we have concluded that the issue is properly before this court and will be addressed on its merits.
In support of his position plaintiff has referred us to a line of cases in which a creditor's claim against a newly formed corporation was recognized where the corporation assumed the assets and continued the business of the original debtor. Wolf v. Shreveport Gas, Electric Light & Power Co., 138 La. 743, 70 So. 789 (1916); S. H. Hanville Lumber & Export Co. v. C-B Lumber Co., 52 So.2d 61 (La.App.Orl.1951); Heard v. Monroe Sand & Gravel Co., 121 So. 642 (La.App. 2d Cir. 1928). In these cases, however, the plaintiffs established fraud on the part of the defendant, whereas in the instant case fraud was neither alleged nor proved. Furthermore, these cases are not directly in point since they concerned the liability of a new corporation for the original debt of the individual(s) who formed the corporation.
Plaintiff's reliance on Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939) is likewise somewhat misplaced since fraud clearly permeated the activities of the defendants.
Of course none of these cases directly apply since they were all decided prior to the enactment of R.S. 12:93D on which plaintiff's case is based. However, in Pasternack v. Louisiana & Arizona Lands, Inc., 254 So.2d 142 (La.App. 3rd Cir. 1971) cited by plaintiff and other recent Louisiana cases in which the statute was applied to afford relief to plaintiffs, they succeeded in establishing fraud on the part of the defendants. Peters v. Crochet Homes, Inc., 370 So.2d 651 (La.App. 4th Cir. 1979); McGregor v. United Film Corp., 351 So.2d 1224 (La.App. 1st Cir. 1977).
The question is whether, in the absence of fraud, the statute applies under the circumstances. Unfortunately we can gain no assistance from Witco Chemical Co. v. Consolidated Terminals Corp., 346 F.2d 631 (U.S. 5th Cir. 1977) because there is no articulation of the facts which led the court to conclude that an unlawful distribution of assets proscribed by R.S. 12:93D had occurred. We have found the answer elsewhere in our research.
The following statement from the annotation at 56 ALR 3rd 212, provides the first clue to a solution:
"The view seems to be generally accepted that a majority or dominant shareholder or a director may make a loan to the corporation and may accept security for the loan, provided the transaction is fair and in good faith. But in view of the fiduciary status which a majority or dominant shareholder or a director occupies with respect to the corporation and to the other shareholders, such transactions are always open to the closest scrutiny by the courts and the burden is upon the lender to show the inherent fairness of the transaction to all parties concerned."
More pertinent to the case at hand but expressive of the same underlying concern for fairness is the following from Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425 (1920):
"The relation of directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the *471 law as are personal dealings between a director and his corporation, and where the fairness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness and where a sale is involved the full adequacy of the consideration. Especially is this true where a common director is dominating in influence or in character. This court has been consistently emphatic in the application of this rule, which, it has declared, is founded in soundest morality, and we now add in the soundest business policy."
These concerns for fairness on the part of officers, directors or dominant stockholders do not preclude them from becoming bona fide creditors of the corporation, but corporate transactions with them are subject to close scrutiny. But when a payment is made by the corporation on account of a valid debt due an officer or director at a time when the corporation is insolvent it is considered an invalid payment. Thus, the following from 19 Am. Jur.2d, Corporation, § 1574, is pertinent:
"The denial of the right of directors of an insolvent corporation to obtain a preference by way of security or payment of debts due them by the corporation is not as a rule founded upon the trust fund doctrine, but upon the theory that it is inequitable that a director, whose position as to knowledge of conditions and power to act for the corporation gives him an advantage, should be permitted to protect his own claim to the detriment of others at a time when it is apparent that all the unsecured debts of the corporation are equally in peril and that all of them cannot be paid. The courts sustaining that rule regard the director as in a sense trustee for all the stockholders and creditors, so far at least as to render it improper for him to act solely for himself in disregard of the interest of those for whom he is such trustee. A director may not take advantage of his superior means of information either by confession of judgment or otherwise."
When NEI collected the $33,185.36 from Alabama it was insolvent. This was its remaining asset while it owed over $200,000 to plaintiff and $290,000 to Lake Forest. With the sale of the Cody Road property no hope remained for the generation of any income in the immediate future. NEI was in a position to scoop up this remaining asset because it was in total control. Its decision through its directors and officers who were also the directors and officers of Alabama was altogether in its own interest and in total disregard of the rights and interests of Alabama's only other creditor, Abraham.
Our decision is buttressed by the opinion of our Supreme Court in Roddy v. Norco Local 4-750, Oil, Chemical, etc., 359 So.2d 957 (La.1978) in which a successor corporation which took title to the debtor corporation's assets was held to be liable to plaintiffs on a judgment they had taken against the old corporation even though there was no proof of fraud. In this case the court recognized as applicable to Louisiana the theory that the properties of a corporation constitute a trust fund for the payment of its debts, 359 So.2d at 960. In the application of this theory the officers and directors of Alabama were fiduciaries who owed a duty to Abraham and their transfer of the last remaining asset of the corporation to NEI was inconsistent with that duty. See 19 Am.Jur.2d, Corporations, §§ 1547 et seq.
Accordingly, the judgment appealed from is reversed and set aside and there is judgment in favor of plaintiff Anthony P. Abraham and against defendants, Lake Forest, Inc. and NEI Corporation, jointly and in solido in the sum of $33,185.36, with legal interest from November 4, 1975, until paid and for all costs of these proceedings.
REVERSED AND RENDERED.