525 So.2d 1113 (1988)
Lewis E. HOOPER, Mid-South Precision Manufacturing, Inc., and Bellemeade Apartments Company
v.
MARUKA MACHINERY CORPORATION OF AMERICA.
No. 87-CA-759.
Court of Appeal of Louisiana, Fifth Circuit.
April 18, 1988.
*1114 William A. Neilson, New Orleans, for defendants-appellants.
Clement P. Donelon, Leefe, Donelon, Donelon & Voorhies, Metairie, for defendant-appellant.
Mark B. Meyers, S. Ault Hootsell III, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, for plaintiff-appellee.
Before KLIEBERT, GRISBAUM and DUFRESNE, JJ.
GRISBAUM, Judge.
This appeal relates to the granting of a motion for summary judgment for $33,200, plus legal interest, coupled with recognition of a vendor's privilege on movable property. We affirm.
INTRODUCTION
Maruka Machinery Corporation of America (Maruka) sold to Mid-South Precision Manufacturing, Inc. (Mid-South) two precision lathes, one of which has been sequestered and is the subject of this appeal. About a year after the original sale, Mid-South, in turn, sold the lathes to Bellemeade Apartments Company (Bellemeade), which did not move the lathes but immediately leased them back to Mid-South for its use. Sometime later, Mid-South was forced to close its doors, and the lathes were consigned for sale. One lathe was moved to the consignment company and sold. The second, the subject of this suit, was moved to a neighboring business, where it was seized by Maruka under writ of sequestration issued by virtue of a claimed vendor's privilege. Having failed to dissolve the writ and having been cast in summary judgment on the merits, Bellemeade appeals.
PROCEDURAL HISTORY
On February 24, 1987 a writ of sequestration issued as prayed for by Maruka. The defendant Bellemeade on March 17, 1987 filed a motion to release the property upon furnishing a bond. On that same date, Lewis E. Hooper and Mid-South (the original vendee of the lathe) filed a motion to dissolve the attachment, contending Maruka had no security device upon which to base the sequestration. Bellemeade (on the same date) filed essentially the same pleading. On April 7, 1987, Maruka filed memoranda opposing the motions to dissolve. Judgment was signed April 28, 1987 and amended (to reflect that Maruka's remedy was against the sequestration bond) May 13, 1987. (Suspensive appeal from the amended judgment was granted Bellemeade June 8, 1987.) A second amended judgment was signed July 14, 1987. Bellemeade suspensively appealed from this last judgment on July 29, 1987.
RECORD FACTS
The record shows that a hearing on the rule to dissolve the attachment was begun on April 9, 1987. First called by Bellemeade *1115 was Mr. Torrey Gormila, a loan officer with First National Bank of Commerce. As such, he was approached in December 1986 by Mr. and Mrs. Lewis Hooper on behalf of Bellemeade concerning investment in certain machinery. Gormila was told that a loan was sought so that Bellemeade could make an investment producing tax savings. Counsel for Maruka stipulates that a cash sale of the machinery took place, that "cash changed hands between Bellemeade Apartments and Mid-South when Bellemeade purchased the lathe from Mid-South and then entered into a lease with Mid-South to lease the machine back." The transaction was consummated in February 1986.
The loan was made to Bellemeade, which is a family partnership composed of Lewis E. Hooper, Dixie Hooper Depp, and Charlotte Hooper Rosshandler. Gormila understands that each held an equal partnership interest. All partners signed as guarantors of the loan, which totaled $245,000, of which $125,000 went to pay off a second mortgage on the apartment building. On cross-examination, Gormila says he dealt with Lewis Hooper as representative of Bellemeade.
Next called by Bellemeade was Douglas Depp, husband of Dixie Depp and owner of various businesses. He was aware of the purchase of the lathes by Bellemeade for $120,000. He did not know the whereabouts of the contested lathe at the time of trial nor of its whereabouts when it was sequestered. Present when the purchase of the lathes was discussed in 1985, Depp though the purchase decision "was a good decision because she [Mrs. Depp, apparently] needed the tax credit against her income and the investment tax credit at that time was ... a healthy deduction." After the purchase by Bellemeade, Mr. Hooper kept the equipment in his possession, leasing it from Bellemeade.
On cross-examination, Depp maintains that, when the deal was discussed Mr. Hooper failed to indicate that some $33,000 was owed Maruka for the lathe. Neither was Depp apprised that the lathe had been in use for some 12 months prior to Bellemeade's purchase. Says Depp, "[W]e thought we were just buying it from a company that was selling a brand new piece of equipment." Thus, Depp originally was of the impression that Bellemeade would be purchasing from another company, not from Mid-South.
Next called by Bellemeade was Lewis Hooper, president of Mid-South (then in liquidation) and managing partner of Bellemeade. He testifies that the lathe in question was purchased new from Maruka in 1985 for $75,200. The original purchase was accompanied by a letter of credit drawn in favor of Maruka and effective from May 21, 1985 to July 28, 1985. On February 24, 1986, the lathe was sold by Mid-South to Bellemeade, Hooper signing both as vendor (president of Mid-South) and vendee (managing partner of Bellemeade). Hooper did not at the time notify Maruka of the sale. Only on February 7, 1987 was Maruka notified, the letter from Hooper stating, "Please be advised that Mid South Precision Manufacturing, Inc., is closed and the Mori Seiki CNC Lathe purchased from you has been sold." The lease agreement between Bellemeade and Mid-South appears of record. Mid-South did, in fact, make a number of lease payments to Bellemeade.
At the time of seizure under writ of sequestration, the lathe was at Southern Shellfish, a company across the street from the location of what had been Mid-South. Both lathes were listed with S & H Machinery for consignment sale; however, one lathe was moved to Southern Shellfish because S & H had no floor space for its display.
Mr. Hooper does not recall whether he informed the Bellemeade partners that the lathes had been used. He also opines that they were unaware that sums were still owing on the lathes. Hooper owns 70 percent of the Mid-South stock, the remaining stock being owned by one David Jackson. The lathes were sold to Bellemeade by authority of a Mid-South corporate resolution.
On cross-examination, Mr. Hooper reiterates he first informed Maruka of the sale *1116 in the February 7, 1987 letter, about a year after the fact. Maruka had tried to work with Mid-South insofar as payment of the debt. In May 1986, in fact, Hooper met with a representative of Maruka in an attempt to negotiate a payment schedule and represented that Mid-South still owned the lathe (sold to Bellemeade about three months previous). In a May 13, 1986 letter, Mid-South made a $5,000 payment to Maruka, Hooper promising to "relinquish the machine" if no payment schedule was submitted within 30 days. Hooper explains he was forced to so represent; otherwise, the lathe would have been picked up immediately.
Bellemeade now is asking $46,000 for the lathe (bonded out of sequestration). Asked if he intends to pay Maruka with any of the proceeds, Hooper states, "No, I don't think so." Mid-South was closed as of the time of trial.
Hearing resumed April 10, 1987. Still under cross-examination, Mr. Hooper reports that a prospective buyer is no longer interested in the lathe. On redirect, Mr. Hooper says that, although he wrote the letter to Maruka that spoke of relinquishing the lathe, he had no authority to return the machine, for Bellemeade owned it at that point. On recross, Hooper recapitulates that Bellemeade paid $115,000 for the two lathes that Bellemeade hopes to sell for $79,000 (one of which has been sold for $33,000). On re-redirect, Hooper maintains that, when the lathes were transferred, it was contemplated that Mid-South would continue as an ongoing operation.
Last called by Bellemeade, Ms. Dixie Depp testifies she is one of the Bellemeade partners. In February 1986, she was aware of the purchase of the lathes but did not know whether or not they were new. She reports that the purchase has been a source of contention between (i.e., among?) her and her husband and her brother.
LAW
Under La.C.C.P. art. 3571,
When one claims the ownership or right to possession of property, or a mortgage, lien, or privilege thereon, he may have the property seized under a writ of sequestration, if it is within the power of the defendant to conceal, dispose of, or waste the property or the revenues therefrom, or remove the property from the parish, during the pendency of the action.
Under La.C.C. art. 3227, in part,
He who has sold to another any movable property, which is not paid for, has a preference on the price of his property, over the other creditors of the purchaser, whether the sale was made on a credit or without, if the property still remains in the possession of the purchaser.
So that although the vendor may have taken a note, bond or other acknowledgement from the buyer, he still enjoys the privilege.
La.C.C. art. 1983 states, "Contracts have the effect of law for the parties and may be dissolved only through the consent of the parties or on grounds provided by law. Contracts must be performed in good faith." (emphasis added). We are further aided in our review by our jurisprudence, which states that the vendor bears the burden of proving the existence of the privilege. Warren Refrigerator Co. v. Fosti MidStream Fueling and Serv., Inc., 462 So.2d 1343, 1347 (La.App. 3d Cir.1985). Moreover, to support a writ of sequestration, the vendor must show he holds a vendor's privilege over the property. Cottonport Bank v. Dunn, 21 So.2d 525, 527 (La.App. 1st Cir.1945).
ISSUE
We are called upon to determine whether a corporation (vendee) may, by an act of sale to a third-party partnership (the managing partner of which is also the majority stockholder in the vendee) and in the face of false disclaimers and deceit (made to the vendor) regarding the subsequent sale, successfully extinguish the vendor's privilege.
ANALYSIS
We note the trial court, in its oral Reasons for Judgment, as stated in the transcript, concluded as follows:
I believe that this cash sale that was entered into on February 24, 1986, was done for a tax credit investment purpose only. True it is a sale. But on the other[]hand, maybe from a tax standpoint *1117 it is a sale. But I just think that Mid-South leased it back on the same date that it was done either to give the credit investment to people who needed this tax credit investment. And that the real person who continued to own and use this machine was Mid-South Precision.
The trial court went on to state:
I have a problem in this case of the closeness of the two entities, namely the Bellemeade Apartments which is operated by the managing partner, Mr. Hooper, as well as Mid-South, which [he] is also the President of. And that's exactly the way the sale of February 24, 1986 is signed, him as managing partner and Mr. Hooper as the President.
I also have a problem in the way Mr. Hooper was doing business with the creditor [Maruka], and that is his letter of May 13, 1986, which is some three (3) months close toten (10) weeks maybe after the sale, is that he sends a letter on Mid-South with a payment. I have a problem with that. [The problem] [i]s that the creditor in this situation is always lead [sic] to believe that this item is still within the possession of Mid-South Precision. And on top of that, the checks which have been introduced as P-6, also indicate that the payments were being made by Mid-South Precision, that they continued to own this particular machine. And not until February of 1987, which is this letter ofwritten was the creditor noticedFebruary 7 of '87. And at that point some two weeks later, February 23rd[,] a suit was filed, claiming the vendor's lien.
Although we do not adopt (in toto) the rationale expressed by the trial court, we find ample support in the record for the factual finding that although Mr. Hooper and his two sisters held equal interests in Bellemeade, he was in fact the managing partner, the decision maker, and the party in control of the day-to-day operations. Moreover, Mr. Hooper had absolute control of Mid-South as its president and a 70 percent shareholder. In these capacities, he conducted the transfer of the lathe in question. As president of Mid-South, he sold the lathe to himself as managing partner of Bellemeade. And, at the same time, he simply leased the lathe back to himself as president of Mid-South.
From this vantage point, Mr. Hooper created a scheme under which, as long as he was able to keep Maruka from exercising its rights as a creditor of Mid-South, funds which would have gone to Maruka and other creditors of Mid-South would instead be paid to Bellemeade and, hence, to himself, pursuant to the lease agreement. Under these circumstances, we consider that Bellemeade never came into valid possession of the lathe and, even assuming it did so, it must be estopped from asserting possession. As the appellees ably point out in their brief, Mr. Hooper had devised a plan whereby, instead of making monthly payments to Maruka to reduce the debt, he was making monthly payments from the company he owned to the partnership he ran. This scenario attempts to make a complete mockery, in any sense, of any ethical standards of business activity in this State. As the appellees correctly point out in brief, to place no "good[-]faith constraints" on such transfers would effectively remove the teeth from a vendor's privilege.
Of equal importance, we note, as the trial court did, that our jurisprudence has historically recognized that corporate principals have a fiduciary relationship not only to the corporate entity but also to its creditors and are, thus, under a certain obligation to see that creditors are paid. See Hibernia Bank & Trust Co. v. Succession of Cancienne, 140 La. 969, 74 So. 267 (La.1917) and Abraham v. Lake Forest, Inc., 377 So.2d 465 (La.App. 4th Cir.1979), writs denied, 380 So.2d 99, 380 So.2d 100 (La.1980).
For the reasons assigned, the judgment of the trial court is affirmed. All costs of this appeal are to be assessed against the appellant.
AFFIRMED.