631 So.2d 679 (1994)
Perry LOPEZ, Plaintiff-Appellant,
v.
TDI SERVICES, INC., et al., Defendants-Appellees.
No. 93-619.
Court of Appeal of Louisiana, Third Circuit.
February 2, 1994.
Rehearing Denied March 11, 1994.
*680 Gerald Charles deLaunay, Lafayette, for Perry Lopez.
George Jacques Forest, Ted Warren Hoyt, Lafayette, for TDI Services, Inc.
Before DOUCET and KNOLL, JJ., and CULPEPPER,[*] J. Pro Tem.
WILLIAM A. CULPEPPER, Judge Pro Tem.
This is a suit by Perry Lopez, a former employee of Thermal Dynamics, Inc., to enforce a final judgment against Thermal Dynamics for past due wages, penalties and attorney fees. The defendants in this suit are TDI Services, Inc. (TDI) (the successor corporation of Thermal Dynamics), Farrell DesOrmeaux (a stockholder and officer of Thermal Dynamics), and Thomas F. DesOrmeaux (the former president, director, CEO and majority stockholder of Thermal Dynamics and director, CEO and majority stockholder of TDI). Lopez alleged defendants' liability for the judgment against Thermal Dynamics under the theories of piercing the corporate veil and conversion. Lopez also claimed ownership of 5% of TDI's stock under promises allegedly made to him by Thomas DesOrmeaux. The trial judge held in favor of defendants, dismissing plaintiff's suit. Plaintiff, Lopez, appeals that judgment. We reverse in part and affirm in part.

FACTS
The history of this case begins with the formation of Star Chemicals, Inc., a waste disposal business of which Thomas DesOrmeaux *681 was the majority stockholder. Star Chemicals used a technology for waste disposal that had been developed by Thomas, together with his father, Farrell, and his brother, Mark.
Around 1985, Star Chemicals stopped doing business and a new company was formed by Thomas DesOrmeaux, Sedsco. Thomas was the majority stockholder in Sedsco, as well as the president, the CEO, and a director. Sedsco used the same waste disposal technology as had Star Chemicals. Sedsco was financed by Gullo-Haas, a Texas corporation. Perry Lopez, plaintiff herein, worked for Sedsco as a salesman.
On March 13, 1985, the first patent application was filed by the DesOrmeauxes on their waste disposal technology.
In September 1985, Gullo-Haas, which had been having numerous problems in its financial dealings with Sedsco, reached a settlement agreement with Sedsco. Sedsco failed to honor the agreement and Gullo-Haas filed suit against Sedsco in April 1986.
On March 17, 1986, the DesOrmeauxes filed a second patent application based on improvements to their technology.
On April 14, 1986, soon after defaulting on the Gullo-Haas loan settlement, Thomas DesOrmeaux formed Thermal Dynamics, Inc. and Sedsco stopped doing business. According to Perry Lopez, Thomas stated that Sedsco was shut down due to its poor financial position, which prevented the company from "moving forward." Farrell DesOrmeaux testified that they had to start the new company (Thermal Dynamics) because Gullo-Haas had taken everything Sedsco had. Gullo-Haas eventually filed suit against Thermal Dynamics and won.
Again, Thomas DesOrmeaux was the president, majority stockholder, CEO, and a director of Thermal Dynamics. Thermal Dynamics used the same technology for waste disposal as had Sedsco. Lopez, along with the other Sedsco employees, went to work for Thermal Dynamics in Lafayette, Louisiana. The furniture, equipment and vehicles from Sedsco were moved from the Sedsco offices to the Thermal Dynamics offices. Thermal Dynamics leased Sedsco's waste disposal equipment until March 1987, when it fabricated its own equipment. Thermal Dynamics received $2.5 million in financing from Barney Shiotani, a California attorney, who was given stock in Thermal Dynamics and made a director.
On August 19, 1986, the first patent was issued to Thomas, Farrell, and Mark DesOrmeaux. On March 15, 1987, Thomas, Mark and Farrell officially granted a license to Thermal Dynamics for use of their patented technology. The patent had an appraised value of $125,000,000. In exchange, Thermal Dynamics paid the nominal application and attorney fees associated with the technology patents. Lopez became the international sales manager for Thermal Dynamics in 1987.
In May 1987, a tax lien was filed against Thomas DesOrmeaux for unclaimed wages from Thermal Dynamics. Thomas admitted at trial that Thermal Dynamics had paid "salaries" to his wife and daughter, which they had turned over to him. Thomas testified that he had done this to avoid creditors, primarily the IRS.
On December 21, 1987, Thomas DesOrmeaux transferred all his stock in Thermal Dynamics to his father, Farrell DesOrmeaux. In return, Farrell allegedly released Thomas from payment of debts totalling between $60,000 and $70,000.
Also on December 21, 1987, Farrell DesOrmeaux signed an appointment and proxy authorizing Thomas DesOrmeaux to continue as president of Thermal Dynamics with full voting power in substitution for Farrell (whether or not Farrell was present at shareholders meetings) and to transact any and all business on behalf of Thermal Dynamics. Thomas testified at trial that he continued to manage Thermal Dynamics on a day to day basis until April 1989, when he formed TDI, Inc. Lopez testified that Farrell was never involved in the operational management of Thermal Dynamics and that, after Farrell acquired Thomas's stock, nothing changed in the daily operations of Thermal Dynamics. In spring 1988, Lopez became an executive vice-president of Thermal Dynamics.
*682 Upon the December 21, 1987 transference of the stock, Thermal Dynamics's license to use the patented waste disposal technology expired under the terms of the licensing agreement.[1] However, Thermal Dynamics continued to do business using the patented technology with the consent of the patentholders. Thermal Dynamics continued to pay the patent application and licensing fees.
On February 3, 1988, a personal financial statement was confected for Thomas DesOrmeaux and his wife, which showed Thomas as owning 63% of Thermal Dynamics's stock, with a value of $4,000,000. The statement was signed by Thomas DesOrmeaux, but he testified at trial that it was incorrect because he had sold his stock to Farrell DesOrmeaux in December 1987.
On February 23, 1988, a second patent was issued to Thomas, Farrell and Mark on their waste disposal technology. The second patent reflected improvements to the technology in the first patent. On June 14, 1988, Thomas bought Mark's and Farrell's one-third interests in the patent, paying them each $150,000. Thomas became the sole owner of the patent.
On May 19, 1988, Thomas DesOrmeaux contracted with Barney Shiotani for additional financing. We note that the contract was signed by "Tom F. DesOrmeaux for himself, Thermal Dynamics, Inc. and Thermal Equipment," as well as by Barney B. Shiotani. At trial, Thomas DesOrmeaux testified initially that his intent had not been to sign as an individual, and that he had only signed on behalf of the corporation. However, he later admitted that Shiotani had wanted his personal signature.
In fall 1988, Thomas DesOrmeaux and John Townsend, a financial consultant to Thermal Dynamics, began to negotiate a contract with Browning Ferris, Inc. (BFI). However, they were unable to interest BFI in Thermal Dynamics. According to Lopez and Townsend, BFI was concerned about Thermal Dynamics's extremely heavy debt load, which had placed it in dire financial straits.
On August 31, 1988, a Thermal Dynamics balance sheet showed $1,236,725 in total current assets, $32,868 in fixed assets less accumulated depreciation, and $106,057 in "other assets" (including patent, brokerage and organizational costs). The balance sheet showed current liabilities of $811,919, longterm liabilities of $2,480,058 (including a $10,199 debt to affiliate Star and a $2,419,859 debt to stockholders), and capital of $1,916,327 for a total of $1,375,650.
On November 15, 1988, Lopez left Thermal Dynamics. Subsequently, he filed a suit for past due wages of $25,975, which he won. Lopez obtained a judgment, on June 26, 1989, for $25,975 past due wages, $12,000 penalties, interest and $5000 attorney fees. That judgment is final.
On December 31, 1988, Thermal Dynamics stopped doing business. Farrell DesOrmeaux testified that Thermal Dynamics, Inc. was never legally dissolved or placed in bankruptcy. However, on May 31, 1989, Thermal Dynamics had an unaudited balance sheet which showed current assets of $278,183, fixed assets of $72,075, and "other assets" (including "brokerage and organizational costs") of $24,102, for total assets of $374,360. The balance sheet showed a total for "liabilities and capital" (including a debt of $3,236,958 owed to Thomas DesOrmeaux) of $374,360.
In April 1989 Thomas DesOrmeaux resigned as president of Thermal Dynamics. Although Thomas was unable to produce any documentation of his resignation, we note that the minutes of a board of directors meeting on April 13, 1989, reflect his resignation as a director and the election of Farrell as president.
On April 5, 1989, TDI Services, Inc. (TDI) was incorporated in Tennessee and operated in Houston, Texas. John Townsend was the president and Thomas DesOrmeaux was the CEO, a director, and the majority stockholder *683 (90%). Most of the Thermal Dynamics employees transferred to TDI in Houston. Thomas transferred the license to use his patented technology from Thermal Dynamics to TDI. TDI was started with $1000 capital from the sale of 1000 shares of stock (for $1 each) to Thomas (900) and John Townsend (100).
Thermal Dynamics was left with no business, no technology, and debts of about $4.5 million. Thomas DesOrmeaux testified that he was Thermal Dynamics's biggest creditor due to his personal payment of the debt to Barney Shiotani. There was testimony by Thomas DesOrmeaux and John Townsend that TDI was originally formed to negotiate a financing contract with a New York lending institution, which was never consummated. However, according to the testimony of Lopez and Townsend, TDI was also formed to escape the heavy debt load of Thermal Dynamics. Thomas testified that the debts of Thermal Dynamics were not a factor in placing the BFI contract with the newly created TDI.
We note that, on August 1, 1989, Farrell DesOrmeaux replied to a letter of inquiry regarding a former Thermal Dynamics employee, in which he stated:
"By way of information, at the time he was employed the company was known as Thermal Dynamics; however, effective July 1, 1989, the name of the company is T.D.I. Services, Inc."
On June 14, 1989, Thomas DesOrmeaux agreed in writing to personally repay the debt owed to Barney Shiotani. Thomas gave Shiotani a promissory note for $4.3 million. Thomas testified that it was for repayment of the $2.5 million loan and for legal services rendered by Shiotani. In exchange, Shiotani transferred his Thermal Dynamics stock to Gary Theall, an attorney, who held it in an account for Thomas. A suspensive condition to this agreement was that TDI contract with BFI. John Townsend testified that the agreement with Shiotani for repayment was made as a result of liability claims made against Thermal Dynamics by Shiotani. Thomas DesOrmeaux, however, stated that Shiotani had never threatened him with legal proceedings and that he had personally taken on the Thermal Dynamics debt to Shiotani out of friendship and a "fiduciary duty". He admitted, however, that he had not felt any obligation to repay the other creditors of Thermal Dynamics (including its former employee, Lopez). As of the time of trial, August 4, 1992, Thomas testified that he had repaid Shiotani's $2.5 million financing loan, but not the $1.8 million for "legal services."
On June 19, 1989, Thermal Dynamics, of which Farrell DesOrmeaux was then sole owner, sold to Thomas DesOrmeaux for $250,000 its equipment, the exclusive right to use the name "Thermal Dynamics, Inc." and all business opportunities. Thomas did not expressly assume liability for Thermal Dynamics's debts. The $250,000 paid by Thomas was distributed by Ted Ayo (the legal counselor and agent for service of process for Thermal Dynamics) to the creditors of Thermal Dynamics who were willing to settle their debts. Lopez testified that any creditors who refused to settle were threatened with bankruptcy by Thermal Dynamics. Lopez refused to settle and received nothing.
Also, on June 19, 1989, TDI contracted with BFI. TDI agreed to fabricate waste disposal equipment, using the same patented technology as had Thermal Dynamics. BFI acquired the right to market and operate the equipment built by TDI and agreed to pay TDI cost plus 20%. However, due to huge cost overruns in fabricating the equipment, the contract was renegotiated and BFI agreed to pay cost only.
We note that on June 12, 1989, seven days before the BFI deal actually went through, TDI had an "unaudited balance sheet" which reflected $401,851 total assets (consisting of prepaid expenses, inventory, metal on order and "organizational costs"), $401,751 total liabilities (consisting of construction advances, materials purchased by BFI for TDI and legal fees), and $100 in equity (common stock). John Townsend, the president of TDI, explained that BFI had advanced TDI $100,000 as "prepaid expenses", due to the dire financial straits of Thermal Dynamics and the pressure put on Thomas DesOrmeaux by Thermal Dynamics's creditors. The "asset" of $100,000 prepaid expenses was offset by a liability of $100,000 in "construction *684 costs". Townsend also explained that the inventory of $208,417 and the "metal on order" of $73,334 were purchase orders of materials made by BFI on behalf of TDI, and were offset by a $281,751 liability to that effect. Townsend stated that the $20,000 organizational costs "asset" was for legal fees. This is offset by a $20,000 liability for legal fees. Finally, Townsend described the $100 common stock "equity" as $100 of capital he himself had put in for 100 shares of common stock to create a total working capital of $100,100 ($100,000 of "prepaid expenses" which was the advance by BFI plus $100).
We note that Thomas DesOrmeaux had previously testified that the inventory reflected on the June 12, 1989, balance sheet was the equipment he had purchased from Thermal Dynamics for $250,000. However, Stanley O. Jester (Thermal Dynamics's vicepresident of finance) and John Townsend testified that TDI had never received or used any Thermal Dynamics equipment. Furthermore, Thomas later testified that the equipment had a scrap value of $105,000 and that he actually received only $12,000 for it.
On June 28, 1989, Perry Lopez obtained his judgment against Thermal Dynamics, Inc., for wages due, penalties and attorney fees. On July 23, 1990, Lopez filed the suit before us now to enforce his 1989 judgment against TDI and Thomas DesOrmeaux, since he could not enforce it against Thermal Dynamics, as well as to claim 5% of the stock in TDI.
On August 23, 1990, Gullo-Haas successfully enforced its judgment against Sedsco to recover from Thomas DesOrmeaux and Thermal Dynamics.
On August 26, 1990, TDI's board of directors passed a resolution authorizing $245,000 of bonuses to the TDI Services management, including $182,000 to Thomas DesOrmeaux and $48,000 to John Townsend. Stan Jester testified that these bonuses were drawn from the remainder of TDI's working capital. John Townsend and Thomas DesOrmeaux both testified that TDI never made any profit due to cost overruns. However, Stan Jester explained that TDI never made any taxable profit. Southdown Thermal Dynamics, a partnership composed of TDI Systems and Southdown, Inc., which succeeded TDI, agreed that those funds that were not needed to pay TDI debts would be paid to certain people related to the partnership. However, the bonuses would be paid by TDI Services rather than paid into Southdown Thermal Dynamics and then paid through TDI Systems because at that time the partnership (Southdown Thermal Dynamics) did not yet have a tax identification number.
On August 31, 1990, TDI Services, Inc. stopped doing business because the BFI contract was completed.
On September 1, 1990, the Southdown Thermal Dynamics partnership was officially formed. The board of directors of TDI Services voted to transfer all of TDI's property, including its building leases, to Southdown in exchange for Southdown taking over all of TDI's debts. Also on September 1, 1990, TDI Systems was incorporated and began doing business in the same offices and with the same personnel as TDI Services. However, TDI Systems not only fabricated waste disposal units, but marketed them as well.
Subsequently, Southdown Thermal Dynamics was replaced by TDI Thermal Dynamics. Stan Jester testified this was merely a name change.

TRIAL COURT ACTION
Trial of this cause was held on August 4, 1992. Various motions and exceptions, which had been previously filed, were denied and dismissed by the trial judge and are not involved in this appeal. During the trial, the trial judge stated, in denying defendants' motion for a directed verdict, that officers of a corporation owe a fiduciary duty to the corporation and its shareholders, but not to its creditors, unless fraud is alleged. After a trial on the merits, the trial judge found that Lopez had failed to carry his burden of proving a donation to him of 5% of the stock in Thermal Dynamics or TDI. The trial judge also found that Lopez failed to specifically plead fraud and that, even if he had, "there was not sufficient evidence of misconduct to allow plaintiff to pierce the corporate veil in that regard." Finally, the trial judge found *685 there was no evidence of "conversion" by Thomas DesOrmeaux of the BFI business opportunity from Thermal Dynamics to TDI.
Lopez appeals the judgment insofar as it dismissed his action to enforce his judgment for past due wages, penalties and attorney fees. Lopez does not appeal the denial of his claim for TDI stock.

OPINION
Lopez contends on appeal that the trial judge erred as a matter of law in failing to hold TDI Services, Inc. liable for the judgment against Thermal Dynamics as its successor corporation, in failing to hold Thomas and Farrell DesOrmeaux personally liable for the judgment against Thermal Dynamics by piercing the corporate veil, and in erroneously placing the burden of proving the fairness of the corporate transactions on Lopez rather than on the defendants.
Inasmuch as TDI Services, Inc. no longer exists, as a practical matter if not by legal dissolution, we will not discuss TDI's liability for Thermal Dynamics's debts, particularly since Lopez did not add TDI's successor corporations as party-defendants. The issue is moot. We will proceed, therefore, with a discussion of Thomas and Farrell DesOrmeaux's personal liability for the debts of Thermal Dynamics under the alter ego theory and under a fiduciary duty.

Alter Ego Theory
The general rule that corporations are distinct legal entities, separate from the individuals who comprise them, and that the shareholders are not liable for the debts of the corporation, is statutory in origin and well supported by the jurisprudence. LSA-R.S. 12:93(B); LSA-C.C. arts. 435, 436, 437. The economic purpose of the shareholder liability shield is to encourage business investments in high risk areas by enabling investors who utilize the corporate form to make capital contributions to corporations while insulating their personal wealth from the risks inherent in business. Riggins v. Dixie Shoring Co., Inc., 590 So.2d 1164, 1167 (La.1991), and cases and authorities cited therein.
Because of the beneficial role of the corporate concept, the limited liability attendant to corporate ownership should be disregarded only in exceptional circumstances. There are limited exceptions to the rule of nonliability of shareholders for the debts of a corporation, where the court may ignore the corporate fiction and hold the individual shareholders liable. The exceptions are made where the corporation is found to be simply the "alter ego" of the shareholder and, usually, fraud or deceit has been practiced by the shareholder acting through the corporation, or the shareholder disregards the corporate formalities to the extent that the corporation ceases to be distinguishable from its shareholders. Some of the factors courts consider when deciding whether to apply the alter ego, or "piercing the corporate veil", doctrine include, but are not limited to: (1) comingling of corporate and shareholder funds; (2) failure to follow statutory formalities for incorporating and transacting corporate affairs; (3) undercapitalization; (4) failure to provide separate bank accounts and bookkeeping records; and (5) failure to hold regular shareholder and director meetings. Riggins, 590 So.2d at 1168, and cases cited therein.
However, it is important to note that closely held corporations are the predominate type of corporation. In reality, corporations owned by one shareholder, or which have a single shareholder who clearly predominates in control and profit participation, are going to do precisely what their owners want them to do. Even if all the "corporate formalities" are followed, they will not separate the personality of the corporation from complete dominance by the principal shareholder. G.G. Morris, "Piercing the Corporate Veil in Louisiana", 52 La.L.Rev. 27, 278 (1991). Therefore, the problems involved in veil piercing cases are to be solved not by "disregarding" the corporate personality, but by a study of just and reasonable limitations upon the exercise of the privilege of separate capacity under particular circumstances in view of its proper use and functions. Glazer v. Comm'n on Ethics for Public Employees, 431 So.2d 752, 757 (La.1983).
When a party seeks to pierce the corporate veil, the totality of the circumstances is determinative. One of the primary *686 components which justifies piercing the veil is often present to prevent the use of the corporate form in defrauding creditors. Riggins, 590 So.2d at 1169, and cases cited therein; American Bank of Welch v. Smith Aviation, Inc., 433 So.2d 750, 755 (La.App. 3d Cir. 1983); Liberto v. Villard, 386 So.2d 930 (La.App. 3d Cir. 1980).
In the case before us, Lopez did not specifically allege fraud as a basis for disregarding the corporate entity. At trial, counsel for Lopez stated that they were not pleading fraud. When fraud or deceit is absent, other circumstances must be so strong as to clearly indicate that the corporation and shareholder operated as one. Kingsman Enterprises, Inc. v. Bakerfield Elec. Co., 339 So.2d 1280, 1284 (La.App. 1st Cir.1976).
A corporate creditor has the burden of proving that the corporate agent is liable for corporate debts. However, where a transaction, on its face, operates to the prejudice of the creditors of the parties thereto, and all the information concerning which is in the possession of the parties to the transaction, those parties bear the burden of satisfactorily explaining the transaction which places the corporation's assets beyond the reach of its legitimate creditors, regardless of whether there is any discernible evidence of fraud. Roddy v. Norco Local 4-750, 359 So.2d 957, 960 (La.1978); Wolff v. Shreveport Gas, Elec. Light & Power Co., 138 La. 743, 70 So. 789, 795 (La.1916). Where no satisfactory explanation is forthcoming from the defendants, the explanation suggested by the allegations of the plaintiff's petition and the facts disclosed by the evidence should be adopted and the defendants, whether a successor corporation or corporate shareholders or officers, should be held liable for the corporation's debts to the plaintiff-creditor. Roddy, 359 So.2d at 960; Wolff, 70 So. at 795.
We note at the outset that the parties stipulated at trial that the corporate formalities were observed by Thermal Dynamics insofar as meetings being held. However, the facts of this case present all the "earmarks of a transaction between persons dealing with themselves". See Wolff, 70 So. at 795. The evidence clearly shows that Thomas DesOrmeaux has incorporated at least six different companies in less than ten years. Each new company was clearly formed in order to escape the liabilities and creditors of its predecessor. The business of each company exclusively involved the DesOrmeaux patented technology for waste disposal, the license for use for which was granted and withdrawn at the whim of the patentholders. The sole patentholder since June 1988 has been Thomas DesOrmeaux. There is no evidence that any of the companies was ever legally dissolved; they simply stopped doing business. Each successor corporation used the personnel and equipment of its predecessor. The operational management of each corporation remained in the hands of Thomas DesOrmeaux.
Thermal Dynamics, Inc. and TDI Services, Inc. were grossly undercapitalized. The only capital contributed by the shareholders was $1 per share, for 1000 shares. All other financing for these companies, running to millions of dollars, came from outside investors, creditors who have, for the most part, not been fully repaid.
We see no policy reason not to hold Thomas DesOrmeaux personally liable for the judgment owed to Lopez by Thermal Dynamics. The purpose of limited liability, to encourage investments in high risk businesses by enabling investors who use the corporate form to make capital contributions while insulating their personal wealth from the business risks, is not served in this case. Thomas DesOrmeaux essentially risked nothing; his creditors risked all. The only asset of value to these corporations, the patent rights valued at $125,000,000, always remained in the ownership and control of the DesOrmeauxes and, since June 1988, of Thomas DesOrmeaux.
One commentator has also pointed out that, regardless of how informally managed or how thinly capitalized a corporation may be, veil piercing should not normally be allowed to impose personal liability on corporate shareholders for consensual corporate debts. He suggests an "implied nonrecourse clause" in cases involving a sophisticated *687 creditor. Therefore, following his analysis of the court's opinion in Abraham v. Lake Forest, Inc., 377 So.2d 465 (La.App. 4th Cir. 1979), writ refused, 380 So.2d 99, 100 (La. 1980), he reasoned that veil piercing should only be allowed where one or more of the following four characteristics are present:
"1. The creditor is less sophisticated than Abrahamis a trade creditor or consumer, for example, or is relatively less sophisticated than the corporate shareholder in terms of corporate finance;
2. A single shareholder controls a number of different corporations, and moves assets back and forth between the various corporations;
3. The shareholder has deliberately stripped the corporation of assets, knowing that it is about to face liability, or has deliberately placed a particular contract or obligation in a shell corporation because he knows that the contract is going to be breached, and does not want to be personally liable (nor lose any substantial assets) as a result of the liability that he knows will arise; and/or
4. The extension of credit to the corporation has been procured at least partly as the result of some false representation made personally by the defendant shareholder or officer (in some cases, the courts treat these fraudulent representations as personal torts of the shareholders or officers, so that piercing is not seen as necessary, and in other cases, the personal fraud is used to justify the piercing)."
(Footnotes omitted.)
G.G. Morris, "Piercing the Corporate Veil in Louisiana" 52 La.L.Rev. 271, 292 (1991).
We find the case before us falls well within the exceptions set forth above. Lopez was an "unsophisticated" creditor in that he was not negotiating a deal on equal footing with Thermal Dynamics, but was simply an employee who was not paid his due wages. Moreover, Thomas DesOrmeaux has obviously manipulated the corporate assets, especially the license to use the patented technology, by continuously moving them on through newly created corporations in order to evade the old corporations' creditors, each time deliberately stripping the old corporation of assets.
Finally, we note Thomas DesOrmeaux's transparent attempt to shield himself from liability as a shareholder for Thermal Dynamic's debts through the alleged transference of his stock to Farrell DesOrmeaux in payment of an alleged debt owed to Farrell. Farrell gave Thomas, in writing, full control of the corporation and the voting rights under the transferred shares of stock. We have even noted, from the minutes of a shareholders' meeting, that Thomas exercised the right to vote Farrell's stock when Farrell was present at the meeting. We regard this transaction as a mere simulation, since defendants have not provided any evidence of either the alleged debt owed to Farrell or that it was fair and valid consideration for the stock. Compare, Withers v. Timber Products, Inc., 574 So.2d 1291 (La. App. 3d Cir.), writ denied, 580 So.2d 378 (La.1991). We conclude under the facts and evidence in this case that Thermal Dynamics, Inc. was the alter ego of Thomas F. DesOrmeaux, due to a failure by Thomas to keep the corporation's identity separate from his own.
Ordinarily, a trial court's findings of fact should not be disturbed on appeal in the absence of manifest error. First Downtown Dev. v. Cimochowski, 613 So.2d 671 (La.App. 2d Cir.), writ denied, 615 So.2d 340 (La.1993); Majestic Floor Coverings, Inc. v. Lawson, 424 So.2d 504 (La.App. 5th Cir.1982). However, we find the trial judge in this case committed an error of law in failing to consider that Thomas DesOrmeaux did not keep his identity separate from that of the corporation. The trial judge only considered the alter ego theory from the perspective of fraud.
We do not, however, find Farrell DesOrmeaux personally liable as well. The part played by Farrell in the management of the corporation was negligible; he had little knowledge or understanding of the business dealings of Thermal Dynamics. Farrell was, apparently, merely a figurehead for Thomas.

*688 Fiduciary Duty
It is well settled that the properties of a corporation constitute a trust fund for the payment of its debts. Roddy, 359 So.2d at 960. The officers and directors of a corporation owe a fiduciary duty not only to the corporate entity, but to the corporation's creditors and, thus, are under a certain obligation to see that creditors are paid. Hooper v. Maruka Mach. Corp., 525 So.2d 1113, 1117 (La.App. 5th Cir.1988); Abraham v. Lake Forest, Inc., 377 So.2d 465 (La.App. 4th Cir. 1979), writs denied, 380 So.2d 99, 100 (La. 1980).
Of course, in the case of a sale in good faith of the property and business of a strictly private corporation, duly authorized by its shareholders, to a third person for an adequate consideration, the property would pass free of encumbrance and the creditors would be relegated to the proceeds in the hands of the debtor corporation. Wolff, 70 So. at 795. Also, McCarthy v. Osborn, 65 So.2d 776 (La.1953).
We note that repayment by Thomas DesOrmeaux of $2,500,000 of the alleged $4,300,000 debt owed by Thermal Dynamics to Barney Shiotani bears very close scrutiny, since Shiotani was an officer, director and stockholder of Thermal Dynamics. If payment is made by a corporation to an officer or director at a time when the corporation is insolvent, such payment is considered invalid. Concerns for fairness do not preclude them from becoming bona fide creditors of the corporation; however, a corporation's transactions with them are subject to close scrutiny. Sea Tang Fish. v. You'll See Sea Foods, 569 So.2d 992, 997 (La.App. 1st Cir.1990), writ denied, 572 So.2d 89 (La. 1991); Missouri Meat Co. v. Richard, 407 So.2d 17, 21 (La.App. 3d Cir.1981), affirmed, 419 So.2d 911 (La.1982); Abraham, 377 So.2d at 471, and cases cited therein. The other creditors of Thermal Dynamics were forced to either settle for less than full repayment from the distribution of the $250,000 Thomas paid Thermal Dynamics for its equipment, business opportunities and name, or, like Lopez, receive nothing at all. Thomas testified that he felt he had a "fiduciary duty" to personally repay Barney Shiotani's debt, but denies having a fiduciary duty to pay a judgment for the wages of a corporate employee.
We cannot accept this as a satisfactory explanation of a fair disbursement of Thermal Dynamics's assets to its creditors. Thomas admitted at trial that he paid Shiotani with proceeds from TDI Services, a venture which was based on the transference by Thomas, from Thermal Dynamics to TDI Services, of the right to use the patented waste disposal technology. Even if we were to consider the payment of the Thermal Dynamics debt with TDI's money as a form of payment for the transference of the license to use the technology, the fairness of such a large payment to a single creditor who was also an officer, director and shareholder of Thermal Dynamics, when other creditors were paid nothing at all, is highly suspect.
Furthermore, there was no evidence presented by the defendants to show that the $250,000 paid by Thomas DesOrmeaux for the equipment, business opportunities and exclusive right to use the name "Thermal Dynamics, Inc." was fair and valid consideration. Given the fact that, in February 1988, Thomas DesOrmeaux set a value on his Thermal Dynamics stock of $4,000,000, this transaction also appears highly suspect.
Therefore, we find that Thomas DesOrmeaux breached his fiduciary duty as an officer and director of Thermal Dynamics to Lopez, a creditor of Thermal Dynamics, to make a good faith attempt to pay his debt. The trial judge erred as a matter of law in finding that Thomas DesOrmeaux owed no fiduciary duty, as a director and an officer of Thermal Dynamics, to Lopez. However, for the same reasons stated earlier in the alter ego theory discussion, we do not find Farrell DesOrmeaux likewise personally liable to Lopez.

DECREE
For the reasons given, the judgment of the trial court is reversed as to defendant Thomas F. DesOrmeaux and we pierce the corporate veil to hold Thomas DesOrmeaux personally liable to Perry Lopez for his judgment against Thermal Dynamics. The judgment is affirmed as to defendants Farrell *689 DesOrmeaux and TDI Services, Inc. Costs of trial and this appeal are assessed to Thomas F. DesOrmeaux.
AFFIRMED in PART; REVERSED in PART.
NOTES
[*] Honorable William A. Culpepper participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.
[1] The patent use license agreement with Thermal Dynamics contained the following clause:

"This License Agreement shall terminate immediately upon dissolution, bankruptcy and/or sale of Thermal Dynamics, Inc. or any change in ownership interest or change in appointment of Board of Directors."